## Huff, et al. v. Woosley, et al.

(Decided June 6, 1919.)

### Appeal from Edmonson Circuit Court.

1. Wills—Mental Capacity of Testator.—Where the evidence was conflicting as to whether testator had sufficient mental capacity to enable him to know the natural objects of his bounty, his obligation to them, the character and value of his estate and the ability to dispose of it according to a fixed purpose of his own, the question of his mental capacity was held for the jury.

2. Wills—Undue Influence.—That the bulk of testator's property was left to the children of a deceased sister, or that the will was signed at the house of one of the favored children, the same being testator's home, or that he had said that the children were the vexation of his life and they thought they owned the plantation, held not to be evidence of undue influence where the testator had taken the part of a father to said children and had manifested his intention on many occasions of leaving his property to them.

3. Wills—Undue Influence.—Undue influence is any influence obtained over the mind of testator to such an extent as to destroy his free agency and to constrain him to do against his will what he would otherwise refuse to do, whether exerted one time or another, directly or indirectly, if it so operated upon his mind at the time of the making or execution of the will.

M. M. LOGAN, SIMS, RODES & SIMS and B. M. VINCENT for appellants.

LOGAN & McCOMBS, JOHN H. GILLIAM and JAMES LOWE for appellees.

OPINION OF THE COURT BY JUDGE QUIN—Reversing.

Thos. J. Woosley was a resident of Edmonson county, and accumulated an estate of approximately $15,000.00. He was a bachelor.

Jane Huff, a sister, shortly after her husband's death in 1890, moved to one of said Woosley's farms, taking her five children with her; she kept house for said Woosley until her death in 1912. They lived together as one family, the brother, the sister and the five children, the brother assuming the place of a father. Shortly after the sister moved to the farm she became an invalid. The brother seems to have been unusually attentive to his sister, and after her death he continued to reside on the farm with his sister's children. He had charge and management of the farm, the work being done in the main by his nephews.

All of the children married and moved away from the farm, with the exception of one, Jesse Huff, who remained on the farm after his marriage, and his uncle continued his residence there with Jesse and his family until the uncle's death December 25, 1916.

While visiting the State Fair at Louisville in September, 1916, the uncle suffered a stroke of paralysis; was brought to the town of Caneyville that day, which was Friday, and remained in the hotel at the latter place until the following Tuesday when he was removed to his home about eight miles distant. He recovered from this paralytic stroke to such an extent as to be able to walk about the room, and a few times to be out of the room. October 19, 1916, he executed his will, which was written by Mr. Robt. Porter, cashier of a Caneyville bank, witnessed by said Porter, George Hobson Woosley, a second cousin, and Doctors R. L. Glasscock and C. C. Threlkel.

His entire property, with the exception of $500.00 each given to two nephews, Sam and Walton Woosley, was left in equal parts to the children of his deceased sister, with whom he had made his home.

From the order admitting the will to probate his other nieces and nephews, forty-odd in number, filed suit contesting the will on the ground of undue influence and mental incapacity; a verdict of the jury found against the will and this appeal is prosecuted to reverse that judgment.

Testator for a time had been president of a bank at Caneyville, and appears to have been a very good business man.

As to his mental incapacity a number of witnesses, including four physicians, testified that in their judgment the testator did not have sufficient

mental capacity to enable him to know the natural objects of his bounty, his obligation to them, the character and value of his estate and to dispose of it according to a fixed purpose of his own. Most of the witnesses, it is true, are interested relatives who would be benefited by the setting aside of the will. Only one of the physicians had seen the testator about the time of the paralytic stroke referred to and that was Dr. Deweese.

For the contestees several witnesses, including those not interested, testified that in their judgment the testator had sufficient mentality to make a will, the two physicians who witnessed the will testifying in behalf of the contestees. The evidence on this point is conflicting, and the verdict not being flagrantly against the weight of the evidence a reversal on this ground cannot be ordered.

Appellants contend there was not sufficient proof to authorize the court to submit an instruction on undue influence. It is true that undue influence, like fraud, can seldom, if ever, be proved by direct evidence, and in order to determine whether or not undue influence was exerted in procuring the execution of a will it is necessary in determining that question that the jury take into consideration all the existing and surrounding circumstances. We do not think the evidence on this question is of sufficient probative value to have authorized such an instruction. That the bulk of the property was left to the children of testator's deceased sister, or that the will was signed at the house of one of the favored children is no evidence of undue influence, the testator lived there, this was his home, he had reared these children, and from the testimony of a number of witnesses it is manifest it had been his intention for years to leave the property just as he did in his will. He had really been a father to these nephews and this niece, and we find nothing unnatural in the provisions of the will, or anything inconsistent with the obligations of the testator to the different members of his family because the nieces and nephews not included in the will had not been the same to him as the children of his deceased sister.

Some time before the will was executed, the exact date not being shown, it is stated by one witness that testator said the Huff boys were the vexation of his life, and on another occasion he said these boys thought they owned the plantation. The claim was also made that certain of

the Huff children would not allow the other nieces and nephews to see the uncle. This happened two or three times, and was due to the fact that the physicians thought it best for the uncle not to have too much company, although one of the witnesses admitted that on the day she complained of not being able to see the testator, when her uncle was later brought out on the porch she did not undertake to converse with him, but listened to the conversation between testator and a friend.

Bennett Woosley, a brother of Sam and Walton Woosley, states that about two weeks before the execution of the will he had a talk with Jesse Huff and Jesse said they were going to have the uncle make a will and told him if he would help them they would give him an equal share with his brothers. On cross-examination this witness admitted he told a certain person that if they would pay him something he would help them, says he did not mention his price but that he "was aiming to read the other man and him not to read me." This alleged conversation is denied by Jesse Huff, and we can find no connection between it and the making of his will.

Except for the fact that Jesse telephoned or sent for some of the witnesses, as requested by his uncle, we find no proof he had aught to do with the execution of the will.

Undue influence is any influence obtained over the mind of the testator to such an extent as to destroy his free agency and to constrain him to do against his will what he would otherwise refuse to do, whether exerted at one time or another, directly or indirectly, if it so operated upon his mind at the time of the making or execution of the will.

Mere general or reasonable influence over the testator is not sufficient to invalidate a will; to have this effect, the influence must be undue, that is, not right or not proper. See Bailey, Admr., et al. v. Bailey, et al., 184 Ky. 455, and the authorities therein cited.

In said case, quoting from Childers' Extx. v. Cartwright, 136 Ky. 498, we said:

"It is not sufficient that it be shown that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised; some evidence must be adduced showing that such influence was exercised. The law permits the owner of property, who is of sound mind and disposing memory, to transmit his

property by last will and testament in such a manner as pleases him, and juries are not permitted to make for him a will that accords with their ideas of justice and propriety; nor are they permitted to suspect away the right of the testator to dispose of his property in accordance with his own will and desire."

In Watson v. Watson's Heirs, 2 B. Mon. 74, it is said: "Nor is there any sufficient ground for apprehending that the will was procured by duress or extraneous influence, either sinister or controlling. It does not appear that either of the devisees ever suggested such a disposition of the testator's estate as that made by this will, or that either of them ever knew, before his death, that he had published such a testament. Their conduct on two or three occasions, may have been somewhat unfilial, and he may possibly have been, in some degree, stimulated thereby to make the contract for his maintenance for the year 1840. But this deduction, if even authorized, would tend to repel rather than to fortify a presumption that, almost immediately after making such a contract, the testator was persuaded by his helpless condition and by threats of desertion, to make a different and far more comprehensive disposition of his estate by will. On the contrary there is some reason for presuming that the will is such as he had long intended to make, and substantially such as the protracted and peculiar services of the two devisees might have entitled them reasonably to expect."

After a careful review of the evidence on the question of undue influence we are satisfied the evidence on this point was not sufficient to have authorized the submission of this issue to the jury and the court erred in so doing.

Wherefore the judgment of the lower court is reversed for further proceedings consistent with this opinion.