# Kentucky Trust Co. et al. v. Gore et al.

Feb. 5, 1946.

David R. Castleman for appellants.

Robert P. Hobson for appellees.

OPINION OF THE COURT BY JUDGE SILER—Reversing.

In this case Ruth C. Gore and Robert A. Campbell, Jr., the appellees, contested the will of their father, Robert A. Campbell, Sr., against Kentucky Trust Company as executor of the will and against the testator's other four children, all appellants. From a verdict of the jury and judgment of the court against the validity of the will and in favor of appellee contestants, the appellant contestees have perfected this appeal.

The grounds for reversal mentioned in appellants' brief are that (1) the court should have given the jury a peremptory instruction in appellants' favor and that (2) the court admitted incompetent and prejudicial evidence on the trial. However, appellants' brief appears to argue chiefly, if not entirely, its first contention that appellants' motion for a peremptory instruction should have been sustained, and this question concerning the legal standing of appellants' claim for a peremptory instruction now faces us for determination on this appeal.

The facts uncontroverted by either side are that Robert A. Campbell, Sr., the testator, who was born in

Scotland, died in Louisville August 11, 1943, at the age of 86; that he was actively employed as Superintendent of Cave Hill Cemetery until 1938, when he voluntarily retired to the position of superintendent emeritus and became merely semi-active thereafter; that he made his will at the age of 83, on April 11, 1940, using a trust official of appellant executor as his draftsman, at a time when no person, except the testator, the trust official, Joseph R. Gathright, and another trust employee, now serving in the Navy, was present; that the will itself is in proper form, duly signed on each page and properly acknowledged by attesting witnesses; that the will provided for payment of debts and taxes, bequeathed a Masonic ring and watch charm to one son, Robert Jr., and bequeathed a watch and chain and small brown whiskey jug bearing the Campbell coat of arms to the other son, David, and bequeathed a large picture of the testator to one daughter, Mrs. Lindsey, and then provided for equal distribution of the residue of his estate, appraised at about $57,000, among his five children, Robert, Jr., Mrs. Mayfield, Mrs. Gardner, Mrs. Lindsey and David; that the will specifically excluded the sixth child, Mrs. Gore, appellee contestant, for the stated reason that she had been amply provided for by her mother and her sister, Jessie, both of whom had previously died; that Mrs. Gore had shared equally with the other five children in the distribution of her mother's estate; that Mrs. Gore's only child, Janet, rather than Mrs. Gore herself, had been the sole and exclusive beneficiary of the will of testator's daughter, Jessie, for an amount in excess of $12,000; that following the death of testator's wife in 1939, the testator arranged, without objection of his other children, for his daughter, Mrs. Lindsey, the older daughter of the two living in Louisville, to move into his home as his housekeeper, the testator thereafter paying to her $100 per month on the household expenses; that this arrangement continued until 1943 when the testator died; that strained family relationship existed between Mrs. Gore and Robert, Jr., in the one group and Mrs. Lindsey and possibly the other three children, in the other group, over a period of years in which the testator was in good relationship with both groups; that the testator, around March 1, 1943, when he was debilitated in both mind and body, made a codicil to his will, which codicil merely made Mrs. Gardner, a daughter, a joint executor of the will in place of Robert, Jr., a son;

that the arrangement for .execution of the codicil was made through telephone conversation between Mrs. Lindsey and the executor's trust official, Mr. Gathright.

The appellee contestants attacked the will on grounds of both the testator's alleged mental incapacity and the appellant contestees' alleged undue influence upon the testator.

There is a great contrariety of evidence in this record concerning his testamentary capacity or lack of it during the latter years of the testator's life, beginning about 1937 or 1939, according to appellee Gore. Testator's own physician, Dr. Flexner, who treated him from June 23, 1941, to the time of his death, or thereabouts, gave the testator full mental capacity in these words:

"Q. 17—Tell the jury, if you please, what was the character of his mentality as was developed by his conversation with you during your examination of him? A. Well, he answered questions very quickly and promptly, and seemed—certainly, for a man of his age, and he was an old man—he seemed to be entirely lucid, knew what was going on. I got to know him much better afterwards than I did at that primary visit. I saw him at his home a few times and got to talk to him, and certainly he was a man of varied interests, and at that time was, I thought, entirely lucid mentally."

On the other hand, Dr. Solomon, who testified as an expert witness answering hypothetical interrogation and who had not treated testator professionally but had known him in a casual way during some years prior to the date of the will, expressed the opinion that the testator did not have mental capacity on April 11, 1940. Dr. Solomon had not seen nor talked with the testator during a period of two or three years prior to April 11, 1940, the date of the will.

There appear to be eight witnesses, including the two appellee contestants and their spouses and Dr. Solomon, used as an expert witness, who testified as to the testator's lack of mental capacity during the general period 1935-1943, but none of them testified as to a continuous lack of mental capacity during that period and none of them testified as to the testator's exact mental condition from personal observation on April 11, 1940, or from any occurrences on that date, the day of the

will. There appear to be thirteen witnesses not including any of appellant contestees, who testified as to the testator's mental capacity during the same general period, 1935-1943.

The one witness who testified specifically and from personal contact as to testator's mental condition on April 11, 1940, was Mr. Gathright, who drew the will on that date at the testator's request and in his presence. Mr. Gathright testified:

"Q. On what day was the will signed? A. April 11, 1940.

"Q. What was his condition of mind at that time? A. He seemed to be quite active, to me, Mr. Castleman. Seemed to be entirely as a normal, average person would be."

Documentary evidence consisting of letters from Mrs. Lindsey, which were dated from November 11, 1941, more than a year and a half after the will was made, to January 4, 1943, indicate that the testator undoubtedly had intervals of mental incapacity during that period of time.

But other documentary evidence consisting of letters from the testator himself to his son, which were dated from February 2, 1940, to May 21, 1940, indicate a full mental capacity in the testator on the dates of those letters, two of these letters dated just 29 days before and just 14 days after the date of the will are as follows:

First Letter

"Louisville, Ky.<br>3.13.40

"Dear Son:

"It is so gloomy & dark today that all the electric lights are turned on. There has been no sunshine for weeks. Plenty of rain with occasional flurries of snow. We are keeping well with the exception of colds.

"Marion is sending you the book you asked for. Hope it reaches you all right. Sorry business is so dull with you. Good weather will be with us soon & then we will have more work than we can do.

"About Sonny's canoe I wish you would go ahead

& get it if he can make up his mind what kind to get. I told him it must be a good one. Never mind the price.

"Time is getting short. Good weather will be here before we know it & he should have it right away.

"We are having troublesome times around the old place but we hope everything will turn out all right. Glad Alice is having such a good time. She seems to enjoy every minute. Hoping to hear soon that Sonny has selected his boat. Love to all the family.

"Yours.     Dad".

Second Letter

"Louisville, Ky.
4-25-40

"Dear Son:

"Please tell Sonny I heartily approve of his change of heart to a motor-boat instead of a canoe. It will be much better all around. He will be much safer with it & then he can take his friends out in it & have a grand time without wearing himself rowing. It is a splendid idea.

"I still want to pay for it. So as soon as you both decide what kind you want to get send me the bill & I will send you a check nobody need know but you are paying for it.

"Ask Sonny if he wants me to keep his blue ribbon prizes until he comes down in June.

"We still lack sunshine & warmer weather. We have had 2 inches more of rain than we get at this season of the year. We are hoping all danger of high water is over. Dogwood, Redbud, Flowering crab apples & cherries are in full bloom. Glad to see business is improving a little. Give my love to all the family. To bad about Aleck's friend Mr. Dunn. We are busy housecleaning.

"Love— Dad"

It is our opinion that there was not enough evidence, nor justifiable inferences to be drawn therefrom, to support the jury's verdict rendered in this case and that accordingly the trial court should have directed a verdict for appellant contestees. As stated above, no

witness testified that the mentality of this old, strong-willed, self-determined Scotchman, the testator, was hovering anywhere near the twilight of dementia on April 11, 1940, when he went alone to appellant executor's office and directed the drawing of his will and then signed and acknowledged same in the presence of witnesses. On the contrary, the trust officer who drafted the will on that occasion, the only witness to testify about the events of that day and occasion, said the testator's mind was then quite active and normal. Aside from that evidence, we may look at the will itself and find it disposing of personal effects, such as a Masonic ring and a small brown whiskey jug, and reasonably conclude that this was the testament of a rational mind that recalled the ownership of even trivial possessions. Also, we may scrutinize the letters, which no one denies were written by this testator, and in these letters, one written 29 days before the will and one 14 days after the will, we find not a line nor a word speaking out against the reasoning powers of its author.

If there were any justification for submitting this case to a jury, such justification would merely be on the basis of permitting the jury to speculate on the possibility of his mental incapacity on April 11, 1940. No witness fixed a continuity of the testator's mental infirmities, which he, similar to many aged persons, undoubtedly had in the final years of his life. While we seriously doubt that he had any pronounced mental infirmity prior to April 11, 1940, yet if he did have some mental infirmity at that and subsequent times before his death, such mental instability merely came and went. There is no testimony that his failure of rationality was a constant condition.

The only evidence whatever tending to put the testator in an irrational condition on April 11, 1940, was Dr. Solomon, an expert witness who answered a hypothetical question on this subject and readily admitted he had not seen the testator during the two years before the will was written. While Dr. Solomon's testimony could furnish a scintilla of evidence, we have heretofore plowed under the scintilla rule in order to stand in the logical soundness of the sufficient evidence rule. Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. 2d 877.

Opinion evidence or conclusion of expert witnesses

will not control when not supported by the proven facts and a directed verdict is proper if the expert testimony forms the foundation of such a case in court. Mutual Life Ins. Co. v. Dause, 256 Ky. 448, 76 S. W. 2d 233; Prudential Ins. Co. of America v. Howard's Assignee, 258 Ky. 366, 80 S. W. 2d 21.

We have held that mere weakness of mental power does not render one incapable of executing a valid will. McCrocklin's Adm'r v. Lee, 247 Ky. 31, 56 S. W. 2d 564; Nugent case, supra.

Also, we have declared mere failure of memory, momentary forgetfulness or lack of strict coherence in conversation does not render one incapable of executing his will. Compton v. Smith, 286 Ky. 179, 150 S. W. 2d 657.

Likewise, old age does not deprive one of the right to dispose of his property as he wills. Kidd v. Rodfus, 241 Ky. 133, 43 S. W. 2d 501.

Even proof of previous insanity without evidence of its continuity down to the date of the will does not destroy the validity of a will. Pfuelb v. Pfuelb, 275 Ky. 588, 122 S. W. 2d 128.

From these well-established principles of law relating to wills, it is easy to understand that the courts guard jealously the rights of all rational people, including the aged, the infirm, the forgetful and the queer, to make wills sufficient to withstand the attacks of those left out and those dissatisfied with the expressed desires of the departed, and this is still true where one child has been left out and all the other children remembered with benefits under the will.

We are likewise of the opinion that there was insufficient evidence of undue influence to warrant a submission of this case to the jury. No one went with the testator to make his will, no one was present at its execution or signing. He was then living in his own home and paying his own expenses and he was apparently not the type of man that might easily be subject to external influences. While it is true his housekeeper-daughter was not on cordial terms with the appellee Gore, that alone is not sufficient to even draw an inference that this will was made through undue influence. This housekeeper-daughter was also not on cordial terms with ap-

pellee Robert A. Campbell, Jr., but the latter was made to share equally in this will. Undue influence exercised against appellee Gore would also undoubtedly have been exercised against appellee Robert, Jr., and would have sprung from the same, identical source. It was a thing of considerable logic for the testator to see fit to exclude appellee Gore in view of the fact that the only child of the latter had already benefited from the family fortunes in general to a greater extent than the other five children would benefit from the will of the testator himself.

Undue influence is any influence obtained over the mind of a grantor or testator to such an extent as to destroy his free agency, and to constrain him to do against his will what he would otherwise refuse to do. But any reasonable influence obtained by acts of kindness or by argument addressed to the understanding is not in law undue influence. Chrisman v. Quick, 174 Ky. 845, 847, 193 S. W. 13.

Mere general or reasonable influence over the testator is not sufficient to invalidate a will; to have this effect, the influence must be undue, that is, not right or not proper. Huff v. Woosley, 184 Ky. 605, 608, 212 S. W. 597.

This court has declared that there are few of us indeed who do not at some time follow the suggestions made by members of our families, and undue influence can not be predicated on this fact where the suggestion is not unreasonable. Schrodt's Ex'r v. Schrodt, 181 Ky. 174, 180, 203 S. W. 1051.

In this case we found, to all practical intents and purposes, no evidence whatever of any exertion of any kind of influence over the testator, but if there might be located some traces of influence over this strongwilled man, the type of such influence was nothing more than what would be called a "general and reasonable" rather than an undue influence.

As we see this will and all the evidence and reasonable inferences as they were produced in this case, we have no hesitation in saying the evidence was insufficient to support the verdict of the jury finding that the testator was lacking in mental capacity or was subjected to undue influence on the occasion when he expressed his personal desires for disposition of his worldly goods in

the form of his last will and testament. Consequently, there should have been a directed verdict.

Wherefore, the judgment is reversed for proceedings consistent herewith.

Judgment reversed.