## Bickel v. Louisville Trust Co. et al.

May 28, 1946.
Rehearing Denied December 13, 1946.

358

William S. Kammerer and Wallis Downing for appellant.

Squire R. Ogden and J. Verser Conner for appellee Louisville Trust Co.

Lawrence S. Grauman for appellees Lawrence S. Grauman, per se and as guardian ad litem for infant appellees Lawrence S. Grauman, Jr., and Anne Armstrong McCaskey.

W. S. Hamilton for appellee Adelaide Strassel McCaskey.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Affirming.

The appeal is from a judgment sustaining the will of Garland Mourning, which was contested by his niece, appellant, Matalea Mourning Bickel. The judgment was entered at the direction of the Court at the conclusion of the evidence introduced by contestant. The entire estate disposed of by the will in contest is the corpus of a trust estate created by the will of testator's father, wherein approximately $78,000 in securities was placed in trust with appellee, the Louisville Trust Company, with directions that the income (approximately $3,500 per year) be paid to Garland Mourning, for life, and granting to him

the power to dispose of the corpus of the estate by will, if he should die without issue, which he did. The grounds of the contest are: (1) That testator was the victim of undue influence; and (2) that at the time of making the will he did not possess testamentary capacity. There is absolutely no evidence of undue influence; and we will concern ourselves solely with the evidence in respect to lack of testamentary capacity.

In Langford's Ex'r et al. v. Miles et al., 189 Ky. 515, 225 S. W. 246, 249, the Court said:

"Statutes conferring the right upon one to make a will disposing of his property after his death extends to the citizen a most valuable privilege, and his right to exercise it has been most vigilantly guarded by the courts. Juries should not be permitted upon mere remote and speculative evidence, having but little, if any, probative force, to take away that privilege, because, forsooth, the terms of the will might not be in accord with their notions of justice or propriety. The law accords to every person the right to dispose of his property by will, if at the time he executes it he has sufficient mind to know his property, the objects of his bounty, and his duties to them, and to dispose of his property according to a fixed purpose. This is the universal rule for the measurement of testamentary capacity, and it is everywhere held that it requires less strength of mind to make a will than is required to execute a contract inter partes, where each party to it has to combat the sagacity and cunning which may be exercised by the other contractor. In such cases one of the parties might be enabled, through a selfish desire to obtain an advantage, to get the better end of the bargain because of his superior mind over that possessed by the one with whom he is contracting. Not so in the execution of wills, which are more often than otherwise executed during one's last sickness, and while he is, so to speak, on his deathbed.

"It is, furthermore, the law that the burden is on the contestant to establish, by testimony of substance and relevant consequence, the mental incapacity of the testator to execute the particular will involved, since it will be presumed that he possessed sufficient capacity to do so."

In Dossenbach et al. v. Reidhar's Ex'x et al., 245

Ky. 449, 53 S. W. 2d 731, 733, which was a will contest, the Court said: ''The rule in this jurisdiction is that a case must be submitted to the jury if there is any evidence (of probative value) tending to sustain the cause of action upon which issue is joined. In determining that question, the court views the evidence in the aspect most favorable to the complaining party. (Citations follow). By the term 'evidence' is included the facts proven and the inferences reasonably deducible therefrom. But a decision may not be rested upon unreal or remote inferences. A pyramiding of inferences is not regarded as sound reasoning, and is not a permissible predicate for a conclusion. (Citations follow). And the proven facts and legitimate inferences drawn therefrom must be something of substance and relevant consequence carrying the quality of proof, and having fitness to induce conviction. (Citations follow.)''

We must be guided by the principles above recited, in arriving at our decision in this case.

Garland Mourning was reared in the lap of luxury. He completed his elementary education in attendance at Manual Training High School in Louisville; he then attended Virginia Military Institute, and Cornell University, where he studied engineering. He returned to Louisville about the year 1917, and became one of the managing officials of the Abell Elevator Company, in which position he failed of success. While attending college, he commenced the excessive use of intoxicating liquors; and, from the year 1921 until the latter part of the year 1930 or the early part of 1931, with the exception of one year spent in a sanatorium, he became and remained an habitual inebriate. During this time—and most of the evidence is confined to this period—he manifested the usual irresponsibilities of persons similarly afflicted. Having had mechanical training, his mind was obsessed with so-called (but who can say?) fanatical and impractical theories in respect to inventions. He related fantastic accounts of his experiences while under the influence of intoxicating liquors; although the experiences recounted are not beyond the realm of possibility. Most of these experiences were testified to by a dentist in Louisville, and have been accepted by us as true accounts of the tales told by the testator (although we would not be sure these stories were the imaginings of the testator, rather than those

of the witness himself, if it appeared in the record, instead of brief for appellees, that the witness was adjudged insane shortly after he testified in the case). Nor are we able to determine that the experiences related by him did not happen; nor that he did not purposely and mischievously fabricate them for his own amusement, in observing the mental gurgitations of a gullible audience: the witness admitted his own astonishment at the testator's uproarious laughter at the conclusion of relating each harrowing experience. But, considering the fanciful stories to have been illusions, they relate only to the time in which the testator was constantly under the influence of intoxicating liquors; and, from the early part of 1931 until his death February 25, 1943, he was a total abstainer. The will was executed in the year 1938. Prior to appellant's marriage in 1931, the testator had been extremely fond of her, and in a previous will had made her the beneficiary of the income of a $10,000 trust estate, granting her the power to dispose of the corpus by will. A few days before her marriage, appellant, who testified that her uncle had been a source of humiliation and embarrassment to her all her life, informed him that she did not want him to come to her home if he intended to attempt to borrow money from her husband. From that day forward, testator did not visit his niece, nor did his niece visit him. He was courteous to her when he met her on the street, but they spoke but few words on any of the occasions. It seems evident that his love for her terminated abruptly with the admonition she gave him; and her testimony reflects the fact that she held him in contempt from her girlhood on.

The testator, with such expensive habits, constantly was without funds, borrowed money from everyone he could, and made no attempt to repay the loans. He was lavish in his expenditure of money in his possession, and had an utter disregard of financial obligations. He was very fond of children, especially those of intimate friends of his: first his niece; next the children of his then friend, R. Rodes Boswell, as evidenced by a will executed by him in 1930; and finally, the infant son of his close friend, Lawrence S. Grauman, as shown by a $5,000 bequest in the will which is the subject of this controversy.

We will not detail the remainder of the evidence in the case, because it is epitomized in the hypothetical

question presented to two doctors who appeared as witnesses for appellant. The question reads:

"Assume that the testator, Garland H. Mourning, was left a spend-thrift trust in 1924 by his father, Garland Mourning, Sr., and assume that he received an income of $3500.00 from the trust, and that he was single and had no dependents, and that he had other large amounts of money left him or paid him, including $15,000.00 by his brother by the sale of stocks, which stocks were left him by his father, and another time he borrowed $2,500.00 on a note from Lawrence Grauman, and another note of $1,850.00 for money from Lawrence Grauman, which he had borrowed with endorsers, and $5,000.00 from Tom Barrett under a will. These sums, in addition to his income, over a period of twenty years; that he was always in debt; that he borrowed daily from anyone from whom he could borrow and without any effort to pay it back; that when his niece married in 1931, and she was his only relative and next of kin, that he claimed to be estranged from her on the belief that she had married one George Bickel, a successful man and a man of an honorable family, and that he refused to go to their home, although he was very proud of his family, and she was his only relative; that he had drunk to excess from his school days until 1930, and had been in an institution for treatment for drinking, and had continued to drink after he left there; that he worked some, but without much financial results; that he had schemes for inventions which he did not complete, and which were regarded as impractical; that he spent his time reading; that he legally adopted a grown man to make him his heir-at-law some fifteen years ago, and then when he wrote his will about ten years later, devising him an amount of only $100.00; that he left his niece only $100.00; that he devised to Anna Armstrong McCaskey, daughter of Adelaide Strassel McCaskey, the sum of $5,000.00, and devised (the residue) to her mother, the lady with whom he boarded, and who is a widow, and who is not related to him, and whose house is composed of her teen-age daughter and her elderly aunt; that he left $5,000.00 to Lawrence Grauman, an attorney, who had loaned him money; that at the death of the widow her daughter shall receive the money for life; that if the widow's daughter dies without issue and without a will,

the money would go to certain charities; that he wrote a codicil the day after he wrote the will, and in that codicil he left $5,000.00 to Lawrence Grauman's son; that as he became older he became seedy, unkept and dirty, causing embarrassment and humiliation to his niece. I will ask you whether or not a man such as I have described had the ability to know the natural objects of his bounty, to make a rational survey of his estate, and to dispose of his estate according to a fixed purpose of his own?''

Each of the doctors, in answer to the hypothetical question, stated that, in his opinion, the testator did not possess testamentary capacity at the time he executed the will in question. As we have heretofore stated, most of the evidence summarized in the hypothetical question concerned accounts of actions of the testator which occurred more than seven years before he executed the will, and at a time when he constantly was under the influence of intoxicating liquors. This evidence was so remote in time as to have no probative value. The facts related by the evidence, and recounted in the hypothetical question, are so isolated and disconnected as to have no weight in the establishment of testamentary incapacity. The mere aggregation of isolated and insubstantial facts does not strengthen the character of evidence adduced by them. In Dossenbach et al. v. Reidhar's Ex'x et al. supra, the Court said:

''It is the accepted rule in this jurisdiction that the opinions of witnesses constitute competent evidence in will cases, but such opinions will not be sufficient evidence to take a case to the jury, unless the facts upon which the opinions are based are such as tend to establish a lack of testamentary capacity. (Citations follow). * * *

''It is quite true that the cumulative effect of evidence as a whole may be greater than the individual items of which it is composed. (Citations). But the mere multiplication of unsupported opinions, based on isolated and disconnected facts without probative weight, adds nothing to the strength of the case. Something cannot be made out of nothing. (Citations follow).''

In this case, as in the Dossenbach case, the testator ''suffered from no disease and exhibited no mental or physical defect or infirmity. He manifested no antipathy,

aversion, or (unexplained) prejudice against any of his relatives, and showed no insane delusions (for seven years previous to and five years after he executed the will) upon any subject.'' True it is that two doctors gave opinions that he was insane; but their opinions were based on simple facts of ordinary understanding, and for that reason are entitled to no greater weight than the opinions of laymen; Dossenbach et al. v. Reidhar's Ex'x et al., supra; and their opinions, as well as those of laymen, under the circumstances, must be supported by recitation of evidence of probative value. One of the doctors testified that, in his opinion, the testator was afflicted with amentia. He followed this statement with the further observation that patients thus afflicted gradually grow worse. The evidence in this case conclusively shows that the testator's mental condition in 1938 was as good as, and by reason of his sobriety perhaps was better than, it was in 1921, the year in which his father executed the will granting him the power to dispose of the corpus of the trust estate. The other doctor who testified as to testator's lack of testamentary capacity stated that his opinion was based partially on information he gleaned from a conversation he had with a lawyer previous to the trial, and on information contained in a letter which he received from one of the attorneys for appellant. Since his opinion was based upon matters which did not appear in evidence, his testimony was incompetent.

Separately considering the various incidents recited in the evidence and contained in the hypothetical question, we find no evidence of lack of testamentary capacity in the establishment of the following facts: The testator's father created a spend-thrift trust for him; he received $3,500 per year therefrom; he was single and had no dependents; he spent the income from the trust, together with some $15,000 from the sale of stocks left to him outright; he borrowed several thousand dollars from friends and spent all of this money over a period of twenty years; and he was always in debt and made no effort to pay any of his financial obligations. His estrangement from his niece is reasonably accounted for by the testimony of the niece herself. The fact that he was an inebriate until seven years before he executed the will is no evidence of lack of testamentary capacity

at the time he executed the will, even though he had been committed to an institution to break him of the habit, and such treatment had not had the desired effect. The fact that he had schemes for inventions, or that he failed to complete them, or that they were regarded by some of the witnesses as impracticable, is not evidence of insanity; and certainly the fact that he spent a great deal of his time reading does not support the contention of appellant. Adopting a grown man as an heir at law is not an infrequent act of persons possessing sound mental facilities; and testator's failure to will the adopted heir more than $100, or his estranged niece more than that amount, does not support the theory. Nor is it uncommon for one possessing a sound mind to devise a substantial sum to one with whom he has made his home; and we think it a very natural thing for the testator to devise to the son of a friend an amount in the approximate sum he had borrowed from, and not paid back to, such friend. Nor is it unnatural or unusual for a testator to provide that a devise should go to charities, in the event the original devisee should predecease the testator. Nor can we say, in the absence of other proof of mental disturbance, that one becoming ''seedy, unkept, and dirty,'' or that such appearance caused embarrassment and humiliation to his niece, would justify a finding that the person did not possess testamentary capacity. History records that Samuel Johnson, who possessed one of the greatest minds of all time, was one of the seediest, most unkempt and personally dirty of all men; likewise, Thomas Paine, another mental giant, is reputed to have been unclean in respect to his person. The aggregation of these trivial, isolated, and unsubstantial matters does not add weight to their probative value.

Since the evidence failed to establish any fact from which the jury reasonably could infer the testator did not possess testamentary capacity, the Court properly directed the jury to find the instrument in question to be the last will and testament of Garland Mourning.

The judgment is affirmed.