**Elby TATE et al., Appellants,**

v.

**C. C. TATE'S EXECUTOR (Earl Templeman) et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 11, 1955.

Tom B. Givhan, Shepherdsville, Melvin K. Duke, Hardinsburg, for appellants.

S. H. Monarch, Hardinsburg, J. W. Hodges, Elizabethtown, for appellees.

CULLEN, Commissioner.

Several nieces and nephews of C. C. Tate, deceased, contested his will on the grounds of undue influence and lack of mental capacity. At the close of their evidence in the contest suit, the court directed a verdict in favor of the will. The nieces and nephews have appealed from the judgment sustaining the will.

Mr. Tate died on March 18, 1953, at the age of 82. His will was executed on February 6, 1953, approximately six weeks before his death. The will left all of his estate to Mr. and Mrs. Hillbreath Allen, in whose home he was living at the time, but to whom he was not related.

Mr. Tate was never married, and had no children. He had lived alone on his farm for many years. For several years prior to 1952 the Allens had assisted him in various ways. In July 1952, after Mr. Tate had been hospitalized for an illness, he made an oral agreement with the Allens to give them all his property in exchange for their agreement to take care of him and pay all his expenses for the remainder of his life. Pursuant to this agreement, Mr. Tate moved into the Allens' home on July 29, 1952, and on July 30 he executed a deed conveying his farm to the Allens. No question has been raised in this suit concerning the validity of the deed; only the will is attacked.

On the issue of undue influence, there was an effort to show that the Allens did not permit any of Mr. Tate's relatives to see him, in the Allen home, except when one of the Allens was present in the room. However, this effort failed, because some of the plaintiff nieces and nephews admitted in their testimony that they talked with Mr. Tate when neither Mr. or Mrs. Allen was present. There also was some effort to show that Mr. Allen handled all the arrangements for the making of the will, but it is quite clear from all the evidence that the person who drafted the will was a friend of Mr. Tate who was called at Mr. Tate's request, and this friend directed Mr. Allen to select the most convenient neighbors as witnesses. We think there was a complete failure to meet the burden of establishing undue influence.

On the issue of lack of mental capacity, the only medical testimony was that of the doctor who attended Mr. Allen during the

last few months of his life. The doctor testified that on the occasion of his last two or three visits, in the "latter part of February", Mr. Tate did not have sufficient mental capacity to make a will. When asked specifically about Mr. Tate's mental condition on February 5, his answer was that he couldn't say. When asked whether he regarded Mr. Tate as being capable of making a will prior to the visits in the latter part of February, his answer was, "Far as I know he could; I had no reason to believe he could or couldn't." Again, when asked whether Mr. Tate was mentally competent to make a will "from the time of your first visit to your last," his answer was, "I will say the last three times, the last week or ten days where those visits were made, I didn't consider that he was; I couldn't say any further back—I had no reason to observe that." The doctor further testified that Mr. Tate's general condition grew gradually worse from the time of his first visit until Mr. Tate's death.

We think it is clear that the doctor's testimony does not show lack of mental capacity on the day the will was executed in the early part of February, particularly in view of the evidence that Mr. Tate's condition was gradually deteriorating as he approached death.

Several of the nieces and nephews expressed the opinion that Mr. Tate was not mentally capable of making a will, giving as the basis for their opinions the following facts: He often cried when his relatives came to visit him. On one occasion he mistook one of his nephews for the latter's brother. On another occasion, when the doctor had been called, another person arrived at the home before the doctor, and stayed in an outer room visiting with the Allens; Mr. Tate thought that the person who had arrived was the doctor and was delaying his services by visiting in the other room, so when the doctor actually did arrive later, Mr. Tate refused to see him. Mr. Tate frequently refused to take the medicine prescribed for him and insisted on drinking Coca Cola instead.

There was considerable testimony by the nieces and nephews as to Mr. Tate's inability to "understand" people in conversation; but it developed that what they had reference to was his inability to *hear* because of a disease affecting his ear. All of the witnesses admitted that they were able to communicate with Mr. Tate by written messages, and except for occasional slowness in answering, he seemed to have no trouble in understanding the written messages. Occasionally Mr. Tate would make statements in oral conversations that were not related to the subject under discussion, but it appears this was because he attempted to engage in the conversations without being able to hear what the other persons were saying.

The only evidence concerning Mr. Tate's capacity to engage in a business transaction was given by a witness who came to see Mr. Tate on February 23, 1953 (two weeks after the will was executed) for the purpose of paying a note. Although the plaintiffs, in putting on this witness, apparently expected that his testimony would show Mr. Tate's lack of mental capacity, actually the testimony showed that Mr. Tate understood the note transaction and handled it in a business-like manner.

■ A neighbor testified that in a conversation in a grocery store, around February 5, 1953, Mr. Allen said that Mr. Tate was "crazy". Obviously, this testimony did not constitute substantive evidence on the question of whether Mr. Tate was in fact "crazy".

■ Several principles applicable in will contest cases were stated in Bickel v. Louisville Trust Co., 303 Ky. 356, 197 S.W. 2d 444. The following principles, from that opinion, are particularly applicable here:

1. The burden is on the contestants to establish, by testimony of substance and relevant consequence, the mental incapacity of the testator, since it will be presumed that he possessed sufficient mental capacity to make the will.

2. In order to take the case to the jury, the proved facts and legitimate

inferences must be substantial and relevant, carrying the quality of proof, and fit to induce conviction.

3. "Opinions of witnesses are insufficient to take a will contest case to the jury, unless the facts upon which the opinions are based tend to establish lack of mental capacity.

4. The more aggregation of isolated and insubstantial facts does not strengthen the character of evidence adduced by them.

Measured against these principles, we think it is clear that the evidence in the case before us was insufficient to warrant submission of the case to the jury. The doctor would not say that Mr. Tate was incompetent on the day the will was written. The only evidence concerning a business transaction showed that Mr. Tate had the mental capacity to handle the transaction. The remaining evidence was merely as to isolated, insubstantial abnormalties that are characteristic of persons of the age and physical condition of Mr. Tate. We think the court properly directed a verdict in favor of the will.

The judgment is affirmed.