Verda MIDDLETON, Appellant,

v.

James MIDDLETON'S EXECUTOR (Ben Middleton) et al., Appellees.

Court of Appeals of Kentucky.

March 23, 1956.

Rehearing Denied June 21, 1957.

J. K. Beasley, Harlan, for appellant.

Smith & Shehan, Harlan, for appellees.

MILLIKEN, Chief Justice.

The appellant, Verda Middleton, seeks to set aside the probate of the will of her ex-husband, James Middleton, and seeks to have a later will, which left his entire estate to her, probated in lieu thereof. Probate of the later will was refused on the ground that the eighty-six year old testator did not have sufficient mental capacity to make a will at the time he executed it, and the refusal was affirmed by the Circuit Court sitting without a jury. The appellees are the children or grandchildren of the testator and are the sole beneficiaries of the earlier, or probated, will.

The testator married his second wife, Verda Middleton, in 1930, when he was ap-

proximately fifty-six and she was twenty-four years of age. He divorced her in 1946 after sixteen years of married life. She was awarded a $1,600 property settlement in the divorce action, and shortly after the divorce was granted she moved to Rockcastle County, Kentucky, to live. Subsequent to the divorce the testator, on January 22, 1946, executed a will by which he devised all of his real estate to his children and grandchildren. After the divorce the elderly testator made his home from time to time with his children, but also lived at times on his home place on which there were a two-room house, a five-room house, and a dance hall known as the Mountain View Club, fronting on Highway 119.

On or about December 1, 1949, the aged testator went to the home of his former wife, Verda, in Rockcastle County ostensibly for the purpose of persuading her to come back to Harlan County to take care of him. She testified that she told him she didn't want to come back because she was "treated rotten" while she was there, but agreed to return with him when he offered to sell her the two-room house, referred to as the "white house," for $1,000. She apparently had told him she had been intending to buy a house in Harlan County and move back so her son-in-law (the husband of her daughter born of a marriage previous to her marriage with testator) could work in the mines.

The testator stayed in Rockcastle County with Verda three days and she drove him back to Harlan County in her car to close the real estate transaction. The "white house" was deeded to Verda on December 7, 1949, and she testified she paid him $500 in cash and "let the car stand for the rest." She returned to Rockcastle County on the bus that evening and remained there until she moved into the "white house" on January 1, 1950. Testator lived in the other house on the property, and Verda apparently waited upon him and tended to his needs. On February 24, 1950, about seven weeks after her return to Harlan County, testator made a will leaving her his property and revoking his former will. The County Court refused to probate this will on the ground that the testator was lacking in mental capacity at the time it was executed.

Verda testified that the testator came to her house on the morning of February 24 and asked her to take him to town, saying he had some papers he wanted to get fixed up while he was able. She took him to town "and turned him up" the stairs leading to the office of Mr. George R. Pope, an attorney, and when she returned to the office to get him, the will had been drawn up. Ruth Alexander, Mr. Pope's secretary, testified that the testator came to Mr. Pope's office alone; that he stated how he wanted to dispose of his property; and that Mr. Pope dictated the will to her. She had heard the testator tell Mr. Pope that his children wouldn't take care of him. When Verda returned to the office the will had been typed, and she remembered Mr. Pope saying to appellant, "Young lady, you came in time to get the witnesses." Verda went down on the street and returned with Denver Sergent and Bill Osborne, who, along with Miss Alexander, signed as attesting witnesses. The will was read to the testator by Mr. Pope in the presence of the witnesses; he (testator) then touched the pen or made an "X" after his name had been signed, and the witnesses affixed their signatures. Mr. Pope was not sure whether Verda accompanied the testator to his office, but he was certain she was not in the room when Mr. Middleton stated how he wanted to dispose of his property.

The evidence bearing upon the testator's mental incapacity at the time of the execution of the second will is not at all convincing. The testimony of Ben Middleton, Jim Henry Middleton and Mrs. M. M. Samuels, sons and daughter, respectively, of the testator and interested parties, who saw their father frequently, testified to the effect that prior to the date of the will on February 24, 1950, testator had been very feeble, had difficulty remembering when he tried to tell them something, and on occasions did not recognize them or Mrs. Ben Middleton, whom he had known for several years. Mrs. Samuels further testified that testa-

tor had lived with her from August, 1949, until December, 1949, when he was treated for bronchial pneumonia; that during that period he was very depressed; and that she found him alone crying on different occasions. Fred Middleton, a nephew of testator, who lived about twenty-five yards from his uncle's home, testified that testator acted strangely for several months before his death. He recited that on occasions testator would come to his home in the nighttime, with a gun, after he and his family had gone to bed, stating on such trips that some one was trying to break into his (Fred's) home. The witness stated that at no time when his uncle would come during the night was any one trying to break into his home.

Denver Sergent, one of the attesting witnesses of the will executed February 24, 1950, and also a witness for the appellees, testified, in substance, that Verda approached him on the streets of Harlan one day near the law office of George R. Pope, and asked him to come to the office and witness a will; that shortly thereafter Mr. Osborne arrived for the same purpose; and that testator was there as were Mr. Pope and his secretary, Miss Alexander. He further testified that the testator did not know Mr. Osborne, saying, "I don't believe I know you," whereupon Verda said, "Why, Jim, this is Bill Osborne," that after the will had been executed and the parties had left the office, the testator again asked who that man was; that he, Denver Sergent, walked with the testator to the car, and the latter asked him if he knew the man and who appellant told him it was. He also stated that the testator, at the time he executed the will, appeared probably normal to him, but that he took a crying spell or two before he affixed his signature to the will and that he "seemed to be in a deep study."

Verda's testimony, bearing on the mental capacity of the testator, was that he was mentally alert at the time he made the will, had been mentally alert up to that time, and continued so thereafter. Although she testified he was physically disabled, she stoutly maintained that his mind was clear and normal. The testimony of other witnesses, including that of Miss Alexander, Mr. Pope and Mr. Osborne, who were present when the will was executed, was to the effect that testator appeared to have a clear mind, was mentally competent to dispose of his property, and acted as though he knew what he was doing. Several other witnesses, who came in contact with the testator in the early months of 1950, gave him a clear bill of mental health during the period, one of them testifying that he took Mr. Middleton some squirrels three days before his death and he was mentally clear at that time.

The only medical testimony was that of Dr. W. P. Cawood, a well-known Harlan physician, who testified for the appellees. We are considering his testimony separately because the trial judge placed great weight on it in holding that the testator lacked mental capacity when he executed the second will in 1950. In his opinion the trial judge declared:

"The lay testimony in this case favors the theory that the old man, Middleton, had sufficient mental capacity to make a will, although there are some isolated instances shown on the other side which would indicate otherwise, particularly that where some of his children testified that he did not know them, on occasions, and that one of his relatives indicated the old man had hallucinations. But considering the medical testimony in opposition with that of the lay testimony in this case, and the proven circumstances surrounding the making of the will of 1950, cumulatively, they seem to the Court to establish a lack of testamentary capacity. See, McKinney v. Montgomery, Ky., 248 S. W.2d 719."

The trial judge's allusion to the circumstances surrounding the execution of the will and his citation of the McKinney case would indicate that he was thinking of undue influence along with the medical testimony. However, he states elsewhere in his judgment that at a pre-trial conference in the case an "order was entered narrow-

ing the scope of the case to the question of mental incapacity and the Court will determine the case on that basis, although it seems proper to consider all the circumstances of the case which might tend to show some overreaching on the part of Verda, as bearing on the mental condition of the testator."

Dr. Cawood testified he had seen Mr. Middleton at intervals for ten years prior to his death. The testator was suffering from a generalized arterial sclerosis, or hardening of the arteries, which condition was mostly due to old age. He thought Mr. Middleton's memory was poor and that his judgment was poor, because hardening of his arteries had lessened the blood supply to the brain and "naturally unbalances a man's thinking, memory and judgment." The doctor said a man in this condition would be like a child as far as judgment and decision are concerned; that he could be suggested to and led; that he didn't think he "would be mentally able for decisions," but that if he made up his mind to do a certain thing, he would be pretty determined to do what he wanted to do. The sum and substance of the doctor's testimony on this point is that the old man had poor memory and poor judgment. We have held that mere weakness of mental power does not render one incapable of executing a valid will. Also, we have declared the mere failure of memory, momentary forgetfulness, and lack of strict coherence in conversation, do not render one incapable of executing a will. Kentucky Trust Co. v. Gore, 302 Ky. 1, 192 S.W.2d 749.

The doctor further testified that several months before the testator's death he treated him for pneumonia; that he saw him last after the fever had gone and that in his opinion the testator's mental condition had worsened so at that time he would not have been able to "do business and protect his own interests." The doctor kept no records and couldn't remember exactly when this illness occurred. The trial judge concluded that this siege of pneumonia took place "evidently in 1949," prior to the last will, but the testimony does not support this finding.

The doctor said the illness occurred a few months before the testator's death. Verda testified that her ex-husband had had pneumonia in May, 1950, three months after the second will was executed, and one of appellees' own witnesses, Fred Middleton, a cousin of the appellees, testified that this illness occurred sometime in 1950, after Verda moved back. Mrs. Samuels, a daughter, testified her father had pneumonia while staying at her home between August and December, 1949, but Dr. Cawood said he treated the testator for pneumonia only once and that was at Middleton's place. Thus, it would appear that the testator had pneumonia after he executed the will leaving his property to his ex-wife, Verda. Therefore, the doctor's testimony concerning the testator's mental condition during and after the siege of pneumonia is not helpful in establishing his mental condition at the time he executed the second will in February of 1950, since that illness apparently occurred after that will was executed. Tate v. Tate's Ex'r, Ky., 275 S.W.2d 597.

The right to make a will is a privilege zealously guarded by the courts, and the privilege may not be taken away without good reason. It has been held that the mental capacity required to make a will is lower than that required to make a deed or a contract, because in the latter instances the element of competition with another person enters the picture. Stege v. Stege's Trustee, 237 Ky. 197, 35 S.W.2d 324; Langford's Ex'r v. Miles, 189 Ky. 515, 225 S.W. 246; Teegarden v. Webster, 304 Ky. 18, 199 S.W.2d 728; Bickel v. Louisville Trust Co., 303 Ky. 356, 197 S.W.2d 444. Nor do old age or senility by themselves deprive a person of the right to devise his property to suit his fancy. Kentucky Trust Co. v. Gore, 302 Ky. 1, 192 S.W.2d 749. The power to disinherit may be the only means an old person has of assuring his needs. Petty v. Pace, 207 Ky. 592, 269 S.W. 713.

In the case at bar, the disposition of his property by the testator in his second will does not strike us as being unnatural. He needed care because of his old age and apparently had to seek it at first one child's

then another's, until he brought his ex-wife, Verda, back to Harlan County to care for him. At the time he made the second will, he apparently had reached the point where he was looking to Verda as his chief reliance. The testimony of the draftsman of the will, his secretary and two attesting witnesses is rather strong evidence that the old man understood what he was doing when he made the will leaving his property to Verda and, other than the fact that she brought him to the draftsman's office, there is no suggestion that she unduly influenced him at the time the will was executed. A will is not unnatural because it departs from the way property would descend by intestacy. Perkins' Guardian v. Bell, 294 Ky. 767, 172 S.W.2d 617. In fact, this Court has declared its increasing tendency is to uphold wills under attack by disappointed relatives who are naturally able to produce evidence of peculiarities or of the natural infirmities of age. Tye v. Tye, 312 Ky. 812, 229 S.W.2d 973. Our recent opinion in Warren v. Sanders, Ex'r, decided in January, 1956, and not yet reported, is an instance in point. For an excellent résumé of Kentucky case law on this subject, see Chapter 9 of Russell & Merritt's "Kentucky Probate Practice and Procedure," West Publishing Co., 1955.

Our opinion in McKinney v. Montgomery, Ky., 248 S.W.2d 719, which was relied on so heavily by the trial court, did hold that the evidence of undue influence and mental incapacity presented a question for the jury, but in that case there was persuasive evidence of undue influence and also evidence of testator's deteriorating mentality following a head injury. As heretofore pointed out, under our decided cases the nature of the evidence in the case at bar does not meet the high standard necessary to deny probate to a will.

The judgment is reversed, and it is ordered that the testator's will of February 24, 1950, be admitted to probate as his last will and testament.

HOGG, J., did not participate in this decision.

CAMMACK, J., dissenting.