James Wister WALLACE and Majorie Reece, Appellants,

v.

Bill SCOTT; Methodist Home of Kentucky; and John P. Blevins, Executor of the Estate of Ardeen Boston, Appellees.

No. 91–CA–2913–MR.

Court of Appeals of Kentucky.

Dec. 24, 1992.

Herbert B. Sparks, Edmonton, for appellants.

Jerry W. Guffey, Leitchfield, for appellee, The Methodist Home of Kentucky.

No appearances for appellees, Bill Scott or John P. Blevins, Executor of the Estate of Ardeen Boston.

Before LESTER, C.J., and McDONALD and MILLER, JJ.

LESTER, Chief Judge.

This is an appeal from a summary judgment in a will contest matter based upon lack of mental capacity upon the part of the testatrix and the exercise of undue influence upon her.

Ardeen Boston died on March 14, 1987. Surviving her were two children, James Wister Wallace and Majorie Reece. Her will, dated September 18, 1973, and a codicil thereto of September 27, 1975, devised and bequeathed all of her estate to appellee, Bill Scott, for use by him during his lifetime, including the income therefrom, with the remainder to the Methodist Home of Kentucky. Her children were excluded from the estate.

In 1955, the decedent and her children purchased a farm one half of the purchase price being furnished by Ardeen and the other half by the children. However, when appellants had the deed drafted, Ardeen was only a one-third owner which must have caused some friction because, some ten years or more after the purchase the decedent brought an action to assert her actual interest in the land against her offspring. The ultimate result of the litigation caused Ardeen to pay appellants $9,000 for their original $1,750 investment which upset her sufficiently to say, "That's the last they'll ever get off me."

Bill Scott enters the scene in the late 1950's when he started helping the decedent with the farm, and he eventually moved in the house with her. By the time she had attorney John Paul Blevins prepare her will and codicil, Scott and Ardeen had known each other for some seventeen years.

As to her health status, Boston had a thyroid problem which responded to medication, a blood pressure condition, and occasional nausea. She was taking a relatively small amount of valium. There is absolutely no evidence from Dr. George McKinley, her physician of long standing, or appellants' expert, Dr. Lawrence P. Green, a psychiatrist, that Ardeen was mentally unsound at the time of the execution of her testamentary documents.

As indicated above, attorney Blevins was the drafter of the will and codicil. His testimony indicated that the testatrix discussed the contents of the documents over a period of time, and she told him why she was making a will and that she wanted to get her business affairs in order, the details of which she was completely aware. Bill Scott was not involved in any steps of formulating or drafting the will, and when the document had been executed, Ardeen placed it in her lock box in the Bank of Marrowbone where it was found following her death. Interestingly enough, Boston never discussed the contents of her will with anyone involved in this litigation.

This action was filed on July 26, 1988, and on November 14, 1988, appellants took the depositions of attorney Blevins and Bill Scott, and appellees took depositions of the plaintiffs-below and of James Cook and Delbert Garmon, two neighbors of Ardeen's. Dr. McKinley's evidence was adduced by appellee Scott on March 16, 1990, but between 1988 and 1990 and thereafter, no steps were taken by appellants. What brought this matter to fruition was Scott's motion for summary judgment filed three years and a day after the complaint which was followed by a hearing and, eventually, a summary judgment on November 13, 1991.

The only issue advanced by appellants is that they were entitled to a trial by jury on the issues of mental capacity and

undue influence. As to the former, in some three years of pendency of this action appellants were unable to discover any evidence of sufficient probative value to demonstrate even the slightest indication of lack of mental capacity on the part of Ardeen Boston at the time of the execution of either her will or codicil. Even the appellants' own expert, Dr. Green, reported in part to their attorney:

In summary from the doctors notes, I can find no indication that the deceased was not of sound mind, even though she did have physical conditions which theoretically could produce such, but I must rely upon the doctors notes in this situation for any evidence of such. Again, it appears that only some time after the codicil was signed that she began to show, as far as the doctors notes were concerned, indicators of emotional distress and treatment thereof.

Dr. McKinley expressed it this way:

Question: From you (sic) recollection of her and from your notes, was Ms. Boston the type of individual who could be easily influenced to do something that she did not want to do?

Answer: I would say definitely not. I mean she was very strong in her opinions....

Question: From your experience and from your training, from your examination and treatment of ... Ms. Ardeen Boston ... from you (sic) records, from your memory, do you have an opinion as to whether Ms. Boston had any mental problems for the period covering September of 1973 and September of 1975?

Answer: No, I never thought ... so. I never thought she had any mental problems.

The only conclusion that could have been reached by the trial court was that over a period of three years the appellants were unable to demonstrate any mental infirmities on the part of the their mother at the time she signed her will and codicil.

■ With respect to the element of undue influence, our courts looked to the "badges" thereof from *Golladay v. Golladay*, Ky., 287 S.W.2d 904 (1955), through *Belcher v. Somerville*, Ky., 413 S.W.2d 620 (1967), and, most recently, *Fischer v. Heckerman*, Ky.App., 772 S.W.2d 642, 645 (1989). To some extent both sides to this appeal rely upon *Fischer*, but as to the influence aspect, we believe it governs. We will examine the "badges" as enumerated by the *Fischer* court. The first such element is a physically weak and mentally impaired testator. There is evidence that Ardeen physically worked about the farm and nothing to show she was mentally impaired. Secondly, is there a will unnatural in its provisions? It might be said generally that to exclude one's children might be considered unnatural, but merely because one happens to be the offspring of a testator does not *entitle* one to be included in an estate. Moreover, there is nothing *requiring* a parent to make such a provision. In the case at bench, there is unrefuted evidence that following the farm title litigation between mother and children, Ardeen said that appellants would get nothing more from her. Just because she kept her own promise does not indicate the exercise of undue influence. Appellants would ascribe the moving into their mother's house by Bill Scott as a sign of undue influence, but they gloss over the fact that they tried to give her a one-third share in the farm when she had contributed one half of the purchase price and then had to pay them $9,000 for a $1,750 investment. If we lay the blame for strained relations at anyone's doorstep, it would have to be at appellants' and not Scott's.

The third "badge" is a lately developed and comparatively short period of close relationship between the testator and the principal beneficiary. From the standpoint of Scott, we note that the time the will was prepared he had known the decedent some seventeen years and had lived on the farm six of those years. This can hardly be considered as a "lately developed and comparatively short period of close relationship." We note that the testatrix did not even know the address of the residuary beneficiary, the Methodist Home of Kentucky, so, in that regard, there was no relationship whatsoever.

The remaining three "badges" are the possession of the will by the beneficiary, efforts by the beneficiary to restrict contacts between the testator and the natural objects of her bounty, and absolute control of the testator's business affairs by the beneficiary. As mentioned above, Ardeen maintained possession of her will by placement in her safety deposit box. Her lawyer related that she was fully aware of her business affairs and maintained control in that respect. Appellant, James Wister Wallace, testified that during the period that his mother lived with Scott, his relationship with the appellee was friendly with no animosity. Reece related she did not see much of Ardeen following the lawsuit over the farm, which is understandable, and she made no mention of any effort by Scott to restrict contacts between she and her mother. For that matter appellants, by way of brief, point out that after Scott started assisting the decedent that "contacts with the children *continued* but became less frequent." (emphasis added).

Thus, we observe that over a period of three years the only evidence the appellants could produce tended to negate the basis of their complaint, namely, mental incapacity and undue influence. Revisiting the *Fischer* opinion at page 645:

The initial issue is the testator's mental capacity at the time the will was executed. The right of a testator to make a will according to his own wishes is jealously guarded by the courts, regardless of a court's view of the justice of the chosen disposition. *New v. Creamer*, Ky., 275 S.W.2d 918, 920 (1955); and *Williams v. Vollman*, Ky.App., 738 S.W.2d 849, 850 (1987). The burden of proof is on contestants, such as appellants, to overcome the presumption of capacity by substantial evidence. *New*, 275 S.W.2d at 920.

and

The next question presented is one of undue influence. Again, the burden of proof is on appellants to establish undue influence with evidence of substance. That proof must go beyond mere opportunity. *Nunn v. Williams*, Ky., 254 S.W.2d 698, 700 (1953). Undue influence

is influence such that the testator's free agency is destroyed. *Id.*, and *Williams*, 738 S.W.2d at 850. It is not influence derived merely from acts of kindness, appeals to feeling, or arguments addressed to the understanding. *Nunn*, 254 S.W.2d at 700; and *Kentucky Trust Co. v. Gore*, 302 Ky. 1, 192 S.W.2d 749, 753 (1946). Moreover, the undue influence must be exercised at the time of the will's execution. *Williams*, 738 S.W.2d at 850.

Applying the principles of law of *Fischer*, we are unable to see any alternative for the trial court other than the entry of the summary judgment.

Since the rendering of *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991), we believe some comment to be appropriate concerning the summary judgment concept. Although *Steelvest* made it more difficult to gain a summary, it did not exclude it from our trial procedures. In reaffirming *Paintsville Hospital v. Rose*, Ky., 683 S.W.2d 255 (1985), *Steelvest* provided at page 483:

We adhere to the principle that summary judgment is to be cautiously applied and should not be used as a substitute for trial. As declared in *Paintsville Hospital*, it should only be used "to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant."

Considering the foregoing together with the *Fischer* requirement that the contestants produce evidence of sufficient character, substance and weight to furnish a firm foundation for a possible jury verdict, which they failed to do herein, then

The judgment is affirmed.

All concur.