## Hines et al. v. Price et al.

June 24, 1949.

H. C. Kennedy and J. S. Sandusky for appellants.

C. Homer Neikirk and H. K. Spear for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Bettie A. May died March 2, 1948, at the age of 83

years. Her will, dated September 24, 1947, was probated in the Pulaski County Court. The husband of the testatrix died in 1909, and she never remarried. One child was born to this union, a girl, but she died in infancy in 1888. At the time the will was executed the heirs of Bettie May were Nettie Price, a niece, Rosa McGriff, a niece, Rosa Tucker, a great-niece, and Raymond Hargis, a great-nephew. Raymond Hargis died in February, 1948, a few days before the death of Bettie May, leaving a widow, Gertie Hargis, and eight children, five of whom were under 21 years of age. The will, after directing that all real and personal property be converted into cash, contained the following bequests: To the Union Church $300, to the Union Church Cemetery $500, to Mrs. W. A. Hines $2,000, to Neatie Cundiff, Charles McGriff, Rosa McGriff, Nettie Price, Raymond Hargis and Rosa Tucker $1,000 each, to E. B. Hargis $300, to Clyde McGriff $100, to Fanny Eckstein $200, to Betty Hargis $100, and to Elsie Dungan $100. Eight shares of bank stock were bequeathed to Nettie Price and Rosa McGriff, and the residue of the estate of the testatrix was bequeathed to her great-great-great nephews and nieces and to Hazel McGriff and Gertie Hargis. W. A. Hines was appointed executor of the will. It appears that all of the persons named in the will were related to the testatrix by blood or marriage except Mr. and Mrs. W. A. Hines, Fanny Eckstein and Elsie Dungan. The heirs of Bettie May appealed from the probate of the will on the grounds of mental incapacity and undue influence. The jury selected to try the case in the Pulaski Circuit Court returned a verdict against the will, and from the judgment declaring the instrument not to be the last will of Bettie May, Mrs. W. A. Hines, Neatie Cundiff, Fanny Eckstein and Elsie Dungan, beneficiaries under the will, and W. A. Hines, executor, have appealed. It is their contention that the evidence, both as to mental incapacity and undue influence, constituted no more than a scintilla, and that under the rule announced in Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. 2d 877, their motion for a peremptory instruction to find for the will should have been sustained.

The evidence shows that the testatrix lived during most of her life at Dabney, in Pulaski County, but some time prior to 1946 she purchased a house in Science Hill,

a few miles from Dabney, and lived there until October, 1946, when she sold the house to W. A. Hines. She returned to Dabney and lived with her niece, Nettie Price, until February, 1947, when she became seriously ill. She was taken to a hospital in Somerset where she remained until some time in May. She went to the home of Fanny Eckstein, a practical nurse, and remained there two or three weeks. In the latter part of May, 1947, she purchased a house in Science Hill and moved to her new home in June. The newly purchased house was located across the street from the house which she had sold to W. A. Hines in October, 1946. Mr. and Mrs. Hines had known the testatrix only a short time before they purchased the house from her. On the day the will was executed W. A. Hines went to the home of Ernest Farris in Science Hill and informed him that Bettie May was at the Hines home and desired him to write her will. Hines, who was deputy jailer of Pulaski County, then went to Somerset and was not present when the will was written. Later in the day Farris, accompanied by May L. Stroud, an employee of the Peoples Bank at Science Hill, went to the Hines home. Mrs. May had left, but Mrs. Hines went across the street and returned with her to the Hines home where the will was written. Farris testified that he and Mrs. May went into the Hines kitchen. Mrs. May told him how she wanted to dispose of her property, and he wrote the will as directed by her. After the will was written Farris read it over to her and Mrs. Stroud was called in and she and Farris signed as witnesses. It appears that a similar will had been written by Farris for Mrs. May two or three months earlier, and her acknowledgment to the will had been taken by a notary public but the will had not been witnessed.

The contestants introduced 25 witnesses and the contestees introduced 28. Three medical witnesses were introduced. Dr. A. A. Weddle first became acquainted with testatrix in March, 1947, when she was in the hospital in Somerset. He was not her physician at that time, but his father was in the hospital for about a month and occupied a room adjoining the room occupied by Mrs. May. Dr. Weddle saw her almost daily while she was in the hospital, and when asked concerning her mental condition said: "I considered it bad all the time

she was in there that I saw her." The witness visited Mrs. May at her home in Science Hill and prescribed for her during her last illness. Concerning her mental condition at that time he said:

"It was bad then, she didn't seem to have very much mind sometimes I would go to see her and she'd know who I was, I'd tell her maybe, and before I left I would have to tell her and maybe the next time she would know me when I went in and before I left she asked me who I was."

He was then asked whether she was sound or unsound in mind when he examined her in Science Hill, and he answered: "I would consider her unsound." Dr. Carl Norfleet, introduced by the contestees, testified that he saw Mrs. May while she was in the hospital though she was not his patient. She was feeble, seriously ill with pneumonia, and her mind was bad, but as her physical condition improved her mental condition improved, and two or three months after her recovery her mind was about the same as it had been before her illness. He never saw her after July 1, 1947. He admitted that he told Mrs. Price that Mrs. May, in her feeble condition, needed someone to help her take care of her business. Dr. R. F. Jasper first saw Mrs. May at his office in Somerset on October 21, 1947. She made two visits to his office, and he began visiting her at her home on December 20, 1947, after she fell and broke her hip. During part of the time after December 20 her mind was not good, but he observed nothing wrong with her mental condition during her two visits to his office in October. It was shown that an inquest was held in January, 1948, and a jury, at a special term of the Pulaski Circuit Court, found that Bettie May, "on account of advanced age, mental impairment and physical weakness and illness," was incapable of managing her estate. A committee was appointed by the County Court. All witnesses testified that Mrs. May was physically frail and weak and weighed not to exceed 75 pounds.

It is argued that the lay witnesses who expressed opinions as to the mental capacity of the testatrix did not state any facts which tended to establish a lack of testamentary capacity. Mrs. Nettie Price testified that the testatrix lived across the road from her at Dabney

for many years, and was in her home daily. Mrs. May lived in the Price home after she sold her house in Science Hill in October, 1946, until she was taken ill in February, 1947, and sent to the hospital. Her mind was bad while she was in the hospital and continued to grow worse after she moved back to Science Hill. The witness visited her there frequently, and saw her on September 21 and 23, 1947, and again on September 25. Mrs. May did not know her on these visits, and was unable to carry on an intelligible conversation. Several witnesses, relatives and intimate acquaintances, testified that Mrs. May failed to recognize them when they visited her and that she was unable to carry on a connected conversation. Several found her rocking a cradle when they visited her, and when asked what she was doing she said she was rocking her baby. There were other scraps of evidence tending to show a weakened mental condition. There was evidence not only that Mrs. May was frail and weak, but that senility had set in. In Mullins v. Mullins, 229 Ky. 103, 16 S. W. 2d 788, 790, it was argued, as here, that the evidence of nonexpert witnesses tending to establish mental incapacity was entitled to little or no weight. It was held that the evidence was sufficient to take the case to the jury, and in the course of the opinion it was said:

"The witnesses were largely members of the family and of the household, including neighbors who were intimately acquainted with testator. They had an opportunity to observe him from day to day and they were entirely familiar with his speech, actions, and general conduct. No expert evidence was introduced. These witnesses could not testify as experts, but they were entitled to testify about normal speech, acts, and conduct of the testator, and to express their opinion based on this personal knowledge."

As is usual in cases of this kind, the evidence as to undue influence was slight, but it was sufficient to take the case to the jury on that issue. The opportunity was present, and W. A. Hines, husband of the principal beneficiary, procured the scrivener of the will which was executed in the Hines home. Several relatives of Mrs. May testified that they visited her frequently, but never when Mrs. Hines was not present and that the latter never permitted them to have a conversation with the

testatrix alone. As was said by this court in Frye v. Jones, 95 Ky. 148, 24 S. W. 5, 6, 44 Am. St. Rep. 206, in speaking of the exercise of undue influence:

"The question is, how shall we detect its presence? Manifestly, this may best be done by that tribunal to which is afforded the opportunity of meeting the witnesses face to face, and hearing them testify in any given case. Before such, the general bearing and conduct of all the witnesses, and especially the mental characteristics of those who are charged with having controlled another, become matters of personal observation and oversight. To a jury of the vicinage, therefore, must be left in a large measure the detection of this refined and subtle, though reprehensible, power. They may not determine its presence without evidence of it, but we may well hesitate to determine the absence of such evidence when in their wisdom it is found to be present."

Where both undue influence and mental incapacity are relied upon, the proof is not required to be as convincing as where mental incapacity alone is charged, Berryman v. Sidwell, 278 Ky. 713, 129 S. W. 2d 154, Leach v. Alger, 302 Ky. 149, 194 S. W. 2d 164, and in determining the issue of undue influence the jury may take into consideration the testator's age and evidence of physical weakness and enfeeblement likely to impair his mind and powers of resistance. Thomas v. Thomas' Adm'r, 258 Ky. 236, 79 S. W. 2d 982; Duvall v. Duvall, 249 Ky. 186, 60 S. W. 2d 351.

Appellants complain because the court refused to withdraw from the consideration of the jury the testimony of several witnesses. It is said in brief that the testimony was "utterly without substance." None of these witnesses expressed an opinion as to the testamentary capacity of the testatrix. They testified to no material fact, and the court's ruling could not have been prejudicial.

For reversal of the judgment appellants finally rely upon the alleged misconduct of a juror. The court heard considerable proof as to this ground when the motion for a new trial was considered. The proof was in direct conflict, and we cannot say the court abused its discretion in overruling the motion for a new trial on this ground.

Judgment is affirmed.