Mary ROLAND et al., Appellants,

v.

William (Billy) EIBECK et al., Appellees.

Court of Appeals of Kentucky.

Dec. 11, 1964.

**38**

William F. Threlkeld, Williamstown, for appellants.

J. L. Ackman, Williamstown, for appellees.

PALMORE, Judge.

Sadie Eibeck died in September of 1961 at the age of 82. She was survived by three children, two sons and a daughter. The sons successfully contested her will on the grounds of mental incapacity and undue influence, and the daughter appeals.

The principal argument is that the evidence was not sufficient to warrant the jury's verdict and that motions for a peremptory and for judgment n. o. v. should have been sustained. On that point we are of the opinion that the evidence was sufficient. It is further contended that the verdict should have been set aside for misconduct of certain jurors in failing to answer correctly questions asked on voir dire. In this respect, being dissatisfied with the state of the record but reluctant to set aside the verdict on a ground that may not have actual merit, we are resorting to the somewhat unusual procedure of remanding the cause for further hearing on that question.

Mrs. Eibeck had been widowed since 1914. Though crippled, it is apparent that before she reached the evening of her life she had been active and able to conduct a small restaurant and service station business in the country. During the last years, however, she could not walk, and had to be carried. She owned two pieces of real estate, a 100-acre farm in Grant County inherited from her mother and an 18-acre place located on U. S. 25 in the same county about two miles south of Williamstown.

One of the sons, William, lived on the farm as a tenant until 1955, when he moved to town. The other son, Johnnie, and his family also lived on her property and in 1958 were occupying a house that was taken for the right-of-way of Interstate Highway 75 (evidently a part of the 18-acre place). When this happened Mrs. Eibeck caused an old dance hall building on the 18-acre place to be remodeled as a home for Johnnie with a room or two for herself. She remained there with Johnnie until the late spring or summer of 1960 and then went

to live with the daughter, Mary Roland, and her husband Howard, who at that time were tenants on a farm in Owen County. She continued to reside with Mary and Howard until her death in September of 1961.

Mrs. Eibeck had written a will in 1957 and deposited it with the county court clerk. The record does not disclose its contents. On September 24, 1960, shortly after she had gone to live with the Rolands, Howard and Mary brought her to Williamstown and she withdrew the 1957 will from the custody of the clerk. On October 15, 1960, they brought her to town again for the purpose of executing a new will (the one now in question), which she did in the presence of two officers of a local bank who came out to the automobile to witness it, and for the purpose of executing a deed conveying the 100-acre farm to Mary, which also was done. The deed was recorded the same day.

At the time Mrs. Eibeck moved from Johnnie's to Mary's, the bulk of her estate consisted of the two pieces of real estate and several thousand dollars in the bank, the main source of which seems to have been a $9,000 payment received from the state in settlement for the condemnation of a part of her property for I–75. (At the time of that settlement she had, incidentally, given $2,000 to Johnnie.) On October 8, 1960, a week before the new will was executed, she bought Mary an automobile for $895.

It was Howard, the son-in-law, who went to an attorney and had the deed and the new will drafted. Oddly, however, neither side saw fit to question him concerning the conversations he must have had with Mrs. Eibeck leading to this event, nor did the attorney (who, as a notary public, took her acknowledgement on the deed) testify. Mary admitted only that her mother had told her she was making a will and was

going to deed the farm to her, but disclaimed knowledge of further details.

The deed[1] recites that it was given in consideration of Mary's promise to care for Mrs. Eibeck during the remainder of her life "and to provide her with such necessities and medical care as she may require in excess of that which the party of the first part may purchase from her own funds and to provide her with a suitable funeral should her estate be unable to bear this expense," etc.

The will leaves the 18-acre place to Johnnie for life with remainder in fee to Mary, $25 to William, $100 to Mt. Lystra Christian Church, $500 in trust for the maintenance of a family cemetery, and the residue to Johnnie and Mary equally.[2]

The evidence tending to prove that Mrs. Eibeck did not have testamentary capacity consisted mostly of testimony that after the death of an invalid son Jimmy in 1957 she had noticeably and progressively "gone down," especially from the mental standpoint, that she would fail to recognize her friends and neighbors, forget who they were, order groceries and forget she had done so, wander from the subject of conversation, and the like. On the day the deed and will were executed Johnnie proved to be Johnnie-on-the-spot in deed as well as in name. Drinking coffee in a pool room near the court house, he noticed Mary and Howard emerging in the company of the county clerk, whereupon he went over to the car and talked to his mother, asking her if she knew what she was doing. She replied, "I don't know. Mary wanted me to sign a piece of paper." "Mom, you know what you are signing?" "I do not. They are always wanting me to sign something."

There was no direct evidence of undue influence, nor any credible evidence of drinking or drunkenness as alleged in the contestants' pleading.

---

1. We are told in the appellees' brief that an action to set it aside is pending.

2. Though it is not pertinent to Mrs. Eibeck's state of mind at the time the will was executed, testimony was introduced showing that her bank account had been substantially reduced by the time of her death 11 months later.

■ The testimony given by the witnesses appearing in support of the will, including the attesting witnesses, the county clerk, Mrs. Eibeck's family doctor, two clergymen, and others, was much the superior evidence on the issue of mental capacity. It makes us distinctly aware of the possibility that the jury usurped Mrs. Eibeck's right to make a will in order to gratify its own notions of what she ought to have done. Nevertheless, when there is substantial evidence to support a verdict, though we of the courts may think it outweighed, we are compelled to uphold the jury's conclusion.

■ In this particular case the overt circumstances leading up to and surrounding the events of October 15, 1960, are of greater persuasive effect than the observations and opinions of the several witnesses bearing on Mrs. Eibeck's mental capacity. It may be granted that the mere opportunity to exert undue influence is not, in and of itself, enough to justify a finding that it *was in fact exercised*. Cf. *Waggener v. General Association of Baptists*, Ky., 306 S.W.2d 271 (1957). Nevertheless, undue influence "is a subtle thing and can rarely be shown by direct proof. In many instances the facts and circumstances leading up to the execution of the desired instrument must be relied upon to establish its existence," *McKinney v. Montgomery*, Ky., 248 S.W.2d 719, 721 (1952), and when a contest is pitched on both mental incapacity and undue influence, evidence that tends to show both need not be as convincing as would be essential to prove one or the other alone. *Hines v. Price*, 310 Ky. 758, 221 S.W.2d 673, 676 (1949).

■■ Mrs. Eibeck's age, her proximity to and physical dependence on Howard and Mary, the relative coincidence of her move to their home and the execution of the deed and will shortly thereafter, Howard's role in these legal events, and his failure to uncover the details that might otherwise have dispelled the unfavorable inferences naturally arising therefrom, are circumstances that together tend to prove undue influence independent of the direct testimony on the issue of her mental capacity. On the whole, we are unable to say that the jury's verdict was not supported by substantial evidence.

Paragraph 3 of the contestants' pleading setting forth the grounds of mental incapacity and undue influence contained allegations to the effect that the Rolands had induced Mrs. Eibeck to indulge in strong drink and by keeping her in a state of drunkenness for long periods of time had destroyed her will power. Although no real proof was introduced to sustain the latter charge, counsel's affidavit filed in support of the motion for new trial says that on voir dire the contents of this paragraph were called to the attention of the jurors, that they were asked if they knew any facts or supposed facts pertinent to the litigation, and that they all answered in the negative. We continue with the affidavit as follows:

"However, this affiant believes that following the trial one of the jurors, who was selected and sworn to try this case stated that he had seen the defendants and Sadie Eibeck in a drunken condition and based on this fact he felt Sadie Eibeck did not have sufficient mental capacity to execute a will. Affiant's belief is based on the fact that in the discussion at the hearing on defendants Motion for judgment N. O. V. counsel for the plaintiff stated to the affiant and to the court that following the trial one of the juror [sic] who had heard the case stated to him that he had seen the defendants, Mary Roland and Howard Roland and Sadie Eibeck in a drunken condition and because of this fact he felt that Sadie Eibeck at the time of the writing of the will lacked sufficient mental capacity to execute a will."

■ Counsel for appellee did not file a counteraffidavit. Though in some jurisdictions a counteraffidavit is neither neces-

sary nor permissible, cf. 66 C.J.S. New Trial § 185, pp. 447–448, the traditional rule in this jurisdiction has been to the contrary. Bratton v. Bryan, 8 Ky. (1 A.K. Marsh.) 212 (1818); Ewing v. Price, 26 Ky. (3 J.J.Marsh.) 520 (1830); Dailey v. Gaines, 31 Ky. (1 Dana) 529 (1833). If the adverse party disputes the facts stated in the supporting affidavit he should counter it. Otherwise it will be taken as true. Dailey v. Gaines, ibid.

The rule that a juror may not impeach his own verdict does not apply to what he said on voir dire. Roland v. Murray, Ky., 239 S.W.2d 967, 970 (1951). Hence if it is true that one of the jurors said what the affidavit alleges counsel for the contestants repeated to the court and adverse counsel, it should be brought into the open. For this reason the cause will be reversed for a hearing on that particular question, and if there be no countervailing affidavit or evidence, or if it be determined that the juror in question did in fact have knowledge of facts that should have been disclosed on voir dire, a new trial must be granted.

The affidavit in support of the motion for new trial states also that on voir dire the jurors were asked if any of them were or had been clients of appellees' counsel, John Lane Ackman, "or the law firm with which he was associated," that they had anwered in the negative, and that one of them, J. W. Bennett, "had been a regular client of L. M. Ackman and the Ackman Law Firm for many years." It does not say, however, that L. M. Ackman and John Lane Ackman were in fact partners or associates, nor does it tell us who composed the "Ackman Law Firm." All the papers in this case indicate that the contestants' counsel from the beginning has been and is John Lane Ackman, an individual. We have no judicial knowledge of his associations, and the affidavit is not sufficient to apprise us. Thus we cannot determine the existence of any prejudicial error relating to this ground of the motion for new trial.

The cause is affirmed in part and reversed in part with directions for further proceedings consistent with this opinion.