**D. H. SEIGLER, Sr., Appellant,**

**v.**

**Ernest SEIGLER et al., Appellees.**

**No. 16587.**

Court of Civil Appeals of Texas.

Fort Worth.

Jan. 22, 1965.

Rehearing Denied Feb. 19, 1965.

Vincent Stine, Henrietta, Humphrey, Gibson & Darden, and Lee Humphrey, Wichita Falls, for appellant.

Clyde Suddath, Henrietta, Jones, Fillmore, Robinson & Lambert, and Clyde Fillmore, Wichita Falls, for appellees.

LANGDON, Justice.

This is a will contest case. The testator, A. R. Seigler, died on February 10, 1963. His last will and testament was executed on November 8, 1961. Application for its probate was made in Wichita County, Texas, on February 14, 1963, by D. H. Seigler, Sr., appellant, who was named as the principal beneficiary in such will. The appellees, Ernest Seigler and his brother and sisters, all of whom were the children

of A. R. Seigler, challenged the jurisdiction of the Wichita County Court to hear and determine the application for probate. The cause was thereafter transferred to Clay County. After hearing, probate of the will was denied and an appeal taken to the District Court for a trial de novo. The case was tried to a jury. It found that at the time A. R. Seigler executed the will dated November 8, 1961, that (1) he was acting under undue influence of D. H. Seigler, Sr., and (2) that he was not of sound mind. On February 6, 1964, judgment based upon the verdict of the jury was entered.

The appellant's appeal is based upon assignments contending the court erred because: (1) it permitted the contestants (appellees) to open and close the arguments; (2) there was no evidence or insufficient evidence to support submission of the undue influence issue or the jury's answer thereto and its submission constituted a comment on the weight of the evidence; (3) submission of the issue on unsound mind and the jury's answer thereto is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust; and (4) the last two points complain of the appellees' closing argument. We affirm.

Before any examination of the jury was commenced the appellees (contestants) by both oral and written motions admitted to and assumed the burden of proof upon the only issues involved, namely, undue influence and lack of testamentary capacity plead by them by way of affirmative defenses. The motions admitted the proponent's (appellant's) allegations and acknowledged his right to recover "except in so far as such right and recovery may be defeated by the pleadings and the evidence presented by contestants (appellees)." On the basis of these motions the appellees urged the court to grant them the right to interrogate the jury first, to present their evidence first and to open and close the arguments. The Court overruled the mo-

tions in so far as the interrogation of the jury and the presentation of the evidence was concerned, but, after the evidence was in and the charge prepared, granted them the right to open and close the arguments.

■ This action of the Court was proper in our opinion since the burden of proof on the whole case under the pleadings and on the issues submitted by the Court's charge rested upon the appellees and because of their admission that appellant would be entitled to recover except in so far as he may be defeated in whole or in part by the allegations in appellees' answer constituting a good defense which may be established on the trial. "The admission shall not serve to admit any allegation which is inconsistent with such defense, which defense shall be one that defendant (appellees) has the burden of establishing." Rules 266 and 269, Texas Rules of Civil Procedure and authorities cited in Vernon's Texas Rules of Civil Procedure.

■ The grounds of undue influence and testamentary incapacity for the voidance of a will are separate and distinct in nature and either is sufficient to set aside a will.

In considering the record and the evidence as a whole we have concluded that the jury's findings of undue influence and incompetence on the part of the decedent at the time of the execution of the 1961 will are well founded on ample evidence and not against the great weight and preponderance thereof.

■ "If the conclusion is reached on appeal that a decedent was incompetent, the court need not determine whether the evidence supports a finding by the jury on the issue of undue influence." 61 Tex.Jur.2d, p. 501, § 339.

We will therefore confine our opinion to the question of testamentary capacity. A portion of the extensive testimony on this question is summarized: A. R. (Albert) Seigler, testator, was seventy-eight (78) years of age on November 8, 1961, when the will in question was executed. He had resided in Clay County, Texas for more than fifty (50) years. He could not read or write.

His first wife was Callie Seigler. They were the parents of appellees. During their marriage they acquired 705 acres of land in Clay County on which they resided until June, 1941, at which time she died intestate. On her death her undivided one-half of the property, including the land, cattle and $12,000 in the bank, was inherited by the five children, appellees herein. The children gave their interest in the personalty to their father, A. R. Seigler. In 1943 four (4) of the children transferred their interest in the land to their father for a nominal consideration. The fifth child transferred her interest to her father in 1946. The bulk of the estate resulted from discovery and production of oil from the above land.

On February 12, 1946, A. R. Seigler married Ila Cunningham Seigler and they lived together in Clay County for approximately fifteen (15) years.

On August 7, 1957, A. R. Seigler executed a will in which he named his five children as his sole devisees, and sometime during the same year he suffered a severe congestive heart attack which caused him to be hospitalized on two different occasions. During this period he was treated and cared for by Dr. R. E. Hurn of Henrietta, Texas.

Early in 1961 A. R. Seigler and Ila were separated and later divorced. After the divorce he lived with his son Ernest on the latter's farm in Clay County for about six (6) months, until on July 26, 1961, he voluntarily entered Gray's Rest Home in Henrietta (Clay County).

A few days after his entry into the Rest Home his half brother, D. H. (Dave) Seigler, Sr., made his appearance.

On November 7, 1961, Dave Seigler took A. R. Seigler to Wichita Falls, Texas, lo-

cated in an adjoining county, and returned him to the Rest Home on the afternoon of November 8, 1961. On the latter date, while in Wichita Falls, A. R. Seigler executed the will made the subject of this suit, in which he left the bulk of his estate to his half brother Dave, and named the latter's son as contingent devisee. Under the will he left $1.00 each to four of his children and $5,000 to one daughter. D. H. (Dave) Seigler, Sr., was named executor of the will without bond. He is the proponent of the will and appellant herein.

A. R. Seigler, on his return from Wichita Falls, continued as a guest in Gray's Rest Home from November 8, 1961, the date of the will under contest, until November 23, 1961.

The will was prepared by and executed in the offices of attorneys selected by D. H. (Dave) Seigler. The decedent was taken to and from the office of the attorneys by Dave Seigler, who remained with him at all times. Dave is a resident of Wichita County, which adjoins Clay County. In spite of the geographical nearness, the half brothers had very little association. During the fifteen year period from 1946 to 1961 they had seen one another on two occasions, including one time at a funeral. There is nothing in the record to indicate that A. R. Seigler was ever acquainted with or had any association with D. H. Seigler, Jr.

There is testimony that prior to his physical and mental deterioration, A. R. Seigler disliked and distrusted Dave Seigler and had on occasions made derogatory comments concerning him which touched upon his honesty and integrity. There was testimony that Dave had "beat" him and other brothers and sisters out of their father's estate, leaving A. R. Seigler with a pair of mules. The decedent was proud of his sons and daughters and had on more than one occasion expressed a desire to leave all of his estate to them. This desire was accomplished by his will of August, 1957.

It would appear that the later actions of A. R. Seigler, in executing a will leaving property to a half brother whom he disliked and naming a contingent devisee with whom he had little or no association while disinheriting his own children whom he had loved and respected and who, by their generosity, had made it possible for him to acquire the estate, speaks louder than any testimony that he did lack testamentary capacity. The jury had every right to believe this and apparently did. However, there is considerably more direct testimony bearing on the question of testamentary capacity from his family doctor, old time friends, his former wife who claims no interest in the estate, and the personnel of the Rest Home in Henrietta where he was a guest for the period before and after the contested will was executed.

These witnesses testified that in their opinion the decedent was of unsound mind before, at the time of, and after the will in question was executed. Their opinion was based upon their contact with, observations of and their dealings with the decedent, which in essence reflected: while residing with his son Ernest during the six months' period following his divorce from Ila he was 78 years of age and deteriorated in mind and body. He suffered with high blood pressure, dizziness, headaches, arteriosclerosis (hardening of the arteries) heart failure, kidney trouble, loss of control over his bodily functions, was feeble, shaky and nervous and walked with a shuffle. His vision, memory and hearing were impaired. Mentally he was childish, repetitious, and easily affected emotionally in that he was easily upset and excitable. He was confused as to the nature, extent, location and value of his property, as well as the identity of his "folks", his Rest Home associates and old friends. His talk was flighty, incoherent, unintelligent and generally made no sense. On occasions he could not complete sentences while speaking. He had become irrational, senile and so befuddled that he lost his prior business acumen and was incapable of attending to his business af-

fairs and did not know in what banks his money was kept. He was helpless both physically and mentally. Beginning in 1957, his mental and physical condition gradually and progressively became worse and continued until the date of his death.

Gray's Rest Home is small, being limited to 24 to 25 patients. Its personnel and patients are closely associated. During the period July to November, 1961, three of the employees at Gray's, who were witnesses, daily conversed with, observed and administered to the personal needs of A. R. Seigler, seeing that he was fed, shaved and bathed. One of them administered medication, checked his blood pressure and physical ailments regularly each day. Based upon their observations of several months as to his actions, his speech, his general conduct and demeanor and appearance, his apparent state of confusion, his loss of memory, his inability to know and recognize members of his family and friends, the location and extent of his property, these witnesses stated that A. R. Seigler was, in their opinion, of unsound mind on November 8, 1961, when the contested will was made.

Dr. R. E. Hurn, personal physician of A. R. Seigler since 1957, visited him on September 30, 1961 and about October 2 of the same year. At such times he observed there had been a change in his mental condition since he last saw him in 1959. That there had been a progressive mental and physical deterioration. There was considerable testimony as to the effect of arteriosclerosis on cells and function of the brain, that there was no cure for it. He found A. R. Seigler confused and uncertain as to what was going on. That "in the state of confusion, not knowing where he was, being quite confused about other things, I would draw the inference that he would be incapable of reasonable judgment." He further testified that decedent was not capable of making a logical deduction to determine the nature and extent of his property or who might be his natural heirs and that he was of unsound mind at the times he saw him. That the usual course of his condition would be

continuous deterioration and that he would have been in the same condition on November 8, 1961, in that he would not have had sufficient mental capacity to engage in business transactions or realize the nature and extent of his property. Dr. Hurn stated that A. R. Seigler would not know where he was or how long he had been at the nursing home. That he was disorientated as to time and place and without any reason believed he was being held at the home. There was other testimony indicating that the decedent was delusional.

The Sheriff of Clay County, who had known Seigler in excess of 10 years, R. W. Bray, Deputy Sheriff of Clay County, a close friend of 15 years or more, and C. M. Peden, Justice of the Peace, lifelong friend, all stated that based on their observations they were of the opinion that A. R. Seigler was of unsound mind. There was considerably more testimony on this point both pro and con, but suffice it to say that in our opinion the evidence was legally sufficient to support the findings of the jury that A. R. Seigler was of unsound mind at the time he executed the will on November 8, 1961, and thus lacked testamentary capacity. There was ample evidence to support the verdict of the jury and from the record as a whole it was not against the great weight and preponderance thereof.

"In accordance with the settled rule which declares that the determination of a trial court upon conflicting evidence is conclusive upon an appellate court, a judgment in favor of the contestant will be affirmed where the record discloses evidence pro and con upon the issue as to mental competency or ability. 'It is not within the province of the appellate court to compare the probative force of the evidence of the opposing sides. * * * No question of preponderance of the evidence is involved.' 'The question of testamentary capacity is ordinarily one of fact for the jury.'

"A reversal will not be ordered because the proponent produced a greater

number of witnesses than did the contestant, the latter's witnesses being shown to have had the better opportunity to be informed as to the decedent's mental state. Again, a finding that the deceased was incompetent is sustainable although the persons who were present at the execution of the instrument have united in testifying that he was of sound mind or competent; proof of delusion is support for a judgment in favor of the contestant." 44 Tex.Jur., p. 574, § 34, and authorities cited in 9 Tex.Jur. Ten Year Supplement, pp. 732–733, § 34 and pocket parts. (61 Tex.Jur.2d §§ 27, 28, 29, 30, 32 and 339.)

The record on this appeal was filed on June 15, 1964, and the briefs on August 24, 1964 and October 22, 1964 by the appellant and appellees, respectively. On November 20, 1964, a very limited portion of the closing argument, including only the statements complained of, certified to by the official court reporter, was submitted for filing as a part of the record. It was not approved by the trial judge. It contained no objections and exceptions or rulings, if any made by the court pertaining thereto. This procedure was not agreed to by opposing counsel. The only reference in the record relating to improper argument is contained in the appellant's motion and amended motion for new trial. The error, if any, complained of was not properly preserved by bill of exceptions and the supplement to the record was not offered for filing within the time and manner provided in Rule 386, T.R.C.P.

 "The complaint as to the argument was not preserved in the proper way, that is, by a bill of exceptions. While the correctness of the excerpts from the court reporter's notes was not challenged, this is not tantamount to an agreement on the part of opposing counsel to bring forward for review the objections to the argument by any other method. Only when the complaining party has presented the matter in a bill of exceptions is the opportunity afforded to his adversary and to the court for

the addition of any appropriate qualification that might render harmless argument that otherwise would be improper or prejudicial. This rule has been almost unanimously adhered to. Smith v. United Gas Pipe Line Co., 149 Tex. 69, 228 S.W.2d 139 (and other authorities cited)." Pritchett v. Highway Insurance Underwriters, 158 Tex. 116, 309 S.W.2d 46 (1958).

All points of error are overruled and the judgment of the trial court affirmed.

Affirmed.