James L. SMITH and Langston Smith, Appellants,

v.

Gordon SMITH et al. in re the Estate of Kate Montgomery Smith, Deceased, Appellees.

No. 11281.

Court of Civil Appeals of Texas.

Austin.

March 31, 1965.

Rehearing Denied April 28, 1965.

Will G. Knox, James R. Sloan, Austin, for appellants.

Emmett Shelton, Austin, for appellees.

PHILLIPS, Justice.

This case involves the contest of two wills executed by Kate Montgomery Smith, now deceased: the one, dated November 14, 1953, with a codicil dated June 15, 1955; the other, dated September 19, 1961. There is no doubt but that Mrs. Smith executed both wills and both were filed and sought to be admitted to probate in the County Court by rival heirs. Trial to the County Court of Travis County without a jury resulted in a judgment denying probate to either will. Upon appeal to the District Court in a trial before a jury, judgment was entered upon a jury verdict denying probate of the will of September 19, 1961 and admitting to probate the will of November 14, 1953 and the codicil thereto dated June 15, 1955.

We affirm the judgment of the trial court.

There is no question about the 1953 will other than the validity of the subsequent will. The codicil to the 1953 will removed Langston Smith, one of the appellants here, as a co-executor.

The controversy before us is the validity of the will of September 19, 1961 which, after voluminous testimony was presented, the jury found that Mrs. Smith did not have the testamentary capacity to execute the will and that in signing the will she acted under undue influence of the above-mentioned Langston Smith.

The appellants and proponents of the 1961 will are Langston Smith and James Smith both children of the deceased Kate Montgomery Smith. The appellees and proponents of the 1953 will are the remaining nine children of Mrs. Smith and one grandchild, the heir of a deceased daughter of Mrs. Smith.

Both wills divide the property among all of the heirs with the exception of the family home which, in the will of 1961, is left to appellant Langston Smith. This bequest of the homestead to Langston Smith is the bone of contention here.

Appellants are before us on seven points of error. The first three points, briefed together, are that the trial court erred in entering judgment denying probate of the will dated September 19, 1961 on the finding of the jury that Mrs. Smith did not have testamentary capacity because such finding is unsupported by any evidence of probative value and is contrary to all the evidence; that such finding is so contrary to the overwhelming weight and preponderance of the evidence as to be unreasonable, unjust and manifestly wrong; that the jury made the finding that Mrs. Smith did not have testamentary capacity as the result of extreme bias and prejudice in the minds of the jury created by evidence of acts of Langston Smith committed at times too remote from the date of said will as to have any relation to or bearing upon the testamentary capacity of Kate Montgomery Smith.

We overrule these points.

■ This case was fully developed and an extensive record was made. The statement of facts consists of some 635 pages of testimony and exhibits. There is ample evidence that Mrs. Smith did not have testamentary capacity at the time she signed the will; there is evidence to the contrary. The law, generally, in this regard, is that a finding that a testator was incompetent is sustainable on satisfactory evidence of the presence of disabling delusions notwithstanding testimony of witnesses that the testator appeared of sound mind at the time he executed the will. 61 Tex.Jur.2d, Sec. 339, p. 498.

At the time Mrs. Smith signed the will of September 19, 1961 she was 86 years old, beset by diabetes, high blood pressure, a broken pelvis and had been kept regularly under sedation. For some time she had required a full time practical nurse. Shortly after having signed the will, she was taken to the hospital and placed under a guardianship. Shortly after this, she was taken to San Antonio where she died.

According to the testimony of Dr. Davidson, her family physician and personal friend of long standing, she had had an attack of pneumonia in 1959 complicated by high blood pressure and hardening of the arteries which made her very ill. He stated that she had become irrational but later recovered, "I would think." He stated that she "was clear most of the time" in 1961, although in September 1961 her "mental condition would waver * * * sometimes she would talk out of her head and * * * she would get people confused;" that her periods of mental confusion were generally in the evening, while in the morning her mind was usually clear. The will of September 19, 1961 was signed in the evening.

Appellees introduced Dr. Davidson's affidavit into evidence incident to the placing of Mrs. Smith under guardianship. This affidavit stated that she was incapacitated on December 4, 1961.

There is also testimony from Dr. Davidson describing Mrs. Smith as being very intelligent, self-reliant and positive; that he considered her to be one of the finest women he had ever known, thoroughly religious and forgiving.

The only witnesses who testified as to Mrs. Smith's mental condition on the evening of September 19, 1961 when the will was signed were a Mrs. Tom Kirkham, a neighbor of Mrs. Smith who visited her about once a week and Mrs. Myzell K. Chapman, a longtime friend who had visited her on the average of three or four times a week.

Mrs. Kirkham testified that at the time the will was signed Mrs. Chapman was with Mrs. Smith when she arrived, that she never noticed anything in Mrs. Smith's conduct different from the other times she had been there; that Mrs. Smith carried on an intelligent conversation with them; that Mrs. Smith was an intelligent woman and could carry on an intelligent conversation about anything; that Mrs. Smith was coherent in her conversation.

As to the signing of the will, Mrs. Kirkham testified that while she and Mrs. Chapman were visiting with Mrs. Smith her son Langston Smith came into the room, brought in the will and handed it to Mrs. Smith; that she did not recall Mrs. Smith making any statement; that Mrs. Smith signed the will and then, to the best of her recollection, she and Mrs. Chapman went over to the bed and both signed as witnesses; that they resumed their visiting for a few minutes and both she and Mrs. Chapman left.

In answer to questions as to Mrs. Smith's appearance and demeanor at the time Mrs. Kirkham testified that there was nothing in her demeanor to indicate that she did not know what she was doing and that there was nothing to indicate that she was under any pressure to sign the instrument. That she did not appear to be reluctant to sign the instrument and seemed to be glad that she was through with it.

The other witness to the will, Mrs. Chapman, testified that Mrs. Smith did not sign the will reluctantly; that she was anxious to sign it; that she signed it gladly and that she was alert. She also testified that on an occasion when she was visiting Mrs. Smith some two or three weeks before, Mrs. Smith told Langston Smith in her presence, "Son, I want that will fixed."

A Mrs. Elmo (Lillian) Smith, the practical nurse who took care of Mrs. Smith from September, 1960 to February, 1961, testified that on several occasions Mrs. Smith had told her that she was going to leave her home to Langston Smith because he had been so good about taking care of her.

James Smith, Mrs. Smith's oldest son who is joined with Langston as an appellant here, testified that while visiting his mother in August of 1961 she told him that she wanted to change her will so that the home place would go to Langston.

There is also testimony that Mrs. Smith had offered to leave the home place to a daughter if she would come and live with her and take care of her. Langston Smith and his wife had moved into Mrs. Smith's home in February of 1961 and had assisted in her care.

A Mrs. Gwendolyn Johnson who acted as a housekeeper and maid for Mrs. Smith from June to September 19, 1961 and who was in daily contact with Mrs. Smith, testified that she was not "exact" and from her talk one could tell that she was "kind of off." She testified that Mrs. Smith would speak of having conversations with her husband who had been dead for several years; the last few days before she left the Smith home on September 18, 1961 (the day before the will was signed) Mrs. Smith thought she had been with her husband and told the witness "last night I talked with my husband." This witness stated that much of what Mrs. Smith said about this time she was unable "to get anything out of."

Gordon Smith, a son, stated that he came to visit his mother immediately after he heard of the execution of the will of September 19, 1961 and that his mother did not recognize him and that she did not even know that he was in the house. When asked why he had not talked to his mother about the controverted will after he learned of its execution, this witness stated that he never thought his mother knew what she was talking about at any time he was with her after September 19, 1961. It was his opinion that Mrs. Smith did not know what she was doing on September 19, 1961.

Mrs. McCarty, one of the Smith childern who lived in San Antonio and had occasion to visit with her mother rather frequently, stated that along about September 1961 "there was never a day when you could talk to her and she would know what she was doing." This was true after the will was executed and "for a good while before." Mrs. McCarty recited the conversations she had had with her mother during Labor Day week-end of September 4, 1961 and stated that her mother did not have her mental faculties during that time; that her mother talked about being poisoned by someone and then about her squirrels being poisoned. Mrs. Smith said that someone was putting poison in her flour.

Mrs. Ruth Jobe and Mrs. Miriam Scheers, both daughters of Mrs. Smith, likewise testified that during the time in question her mother did not know what she was doing.

On the other hand, a Mrs. Dearing, a nurse who had attended Mrs. Smith in the hospital, testified that Mrs. Smith was of sound mind while she was in the hospital.

The abovementioned testimony of Dr. Davidson was from a former trial. At the time of this trial, Dr. Davidson had died, however there is testimony from a Dr. James E. Hill who, among other qualifications, had taught pharmacology and toxicology at the University of Texas Medical School. When shown a list of drug prescriptions containing narcotics that had been purchased for Mrs. Smith and the dosages prescribed, Dr. Hill was of the opinion that she could have been maintained in a toxic state comparable to intoxication from the excessive use of alcohol. That the use of these drugs could have caused her to be in a state, or condition wherein she was not clear at all times as to where she was, who the people around her were or actually aware of what she was doing.

There is no testimony of any witness, other than Langston Smith, that Mrs. Smith actually knew of the terms of the will at the time it was being drawn or that she knew the contents of the instrument at the time of its execution before the two witnesses. Langston Smith did testify that he had had an attorney draw the will from notes his mother had given him and that he had read the will to her several days before she signed it.

■ From this summary of the evidence we hold that there was ample testimony from which the jury could have come to the conclusion that Mrs. Smith did not have testamentary capacity to make a valid will on September 19, 1961.

■ Ordinarily, if the conclusion is reached on appeal that a decedent was incompetent, the court need not determine whether the evidence supports a finding by the jury on the issue of undue influence, 61 Tex.Jur.2d Sec. 339, p. 498. However in this case we have certain testimony regarding undue influence that has been objected to by the appellants in the trial court, and incorporated in their points of error before this Court, to the effect that the admittance of the testimony on undue influence was prejudicial to appellants, not only on the issue of undue influence, but also on the issue of testamentary capacity. For this reason we feel that we must discuss the evidence pertaining to undue influence which includes certain defalcations on the part of appellant Langston Smith.

Since the death of his father, Lon Smith, in 1947, Langston Smith, an attorney by

profession, handled his father's estate along with that of his mother. From 1947 until 1956, Langston had access to the testatrix's records including her bank records, checks and statements. In 1955 Mrs. Smith learned from discrepancies in her bank balances that Langston had been embezzling money from the estate. At this time she added the codicil to her will mentioned above, wherein she removed Langston as a co-executor of her estate. He had been so designated by the will of 1953.

During 1955 and 1956, Mrs. Smith and certain other of her children attempted to find out exactly the amount Langston had taken. There is some variance in the testimony in this regard, however Langston admitted embezzling $18,135.23. He sold his home in an attempt to make restitution which allowed him a credit of $4,932.82. As we understand the record at least a part of this amount was embezzled from the Lon A. Smith estate, or the estate of Langston's father.

When Langston Smith testified at the trial of the case at bar, at first he admitted taking some two thousand dollars from his mother's estate; however, as the evidence was developed it appeared that some $25,-375.65 had been embezzled. It is not entirely clear from the record before us, however it is our understanding that this amount includes the abovementioned $18,-135.23 less the abovementioned credit for the house.

There is a possibility from the record presented that the defalcations set out above are not necessarily all that Langston Smith is accountable for as a thorough audit has yet to be made. It is also clear, however, that Mrs. Smith was not aware of the magnitude of Langston Smith's defalcations at the time of her death.

From the detailed evidence brought out at the trial of this case wherein appellees introduced forged checks, altered bank statements, checks for smaller amounts crudely enhanced to greater amounts, all admittedly manipulated by Langston Smith,

it is not difficult to perceive a scheme or plan of conduct conducted by Langston Smith against the estates of both his mother and his father. This conduct apparently terminated in 1955 or 1956 when his mother became suspicious and entrusted her estate to the management of another son, Lon Smith, Jr.

In Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, the Supreme Court stated that "It is impossible to lay down any hard and fast rule, or rules, which will accurately govern the question as to whether a given record contains affirmative probative evidence of undue influence." In this same case the Court recognized that proof of undue influence by direct testimony is rarely possible; that such proof usually must be, and is, rested in circumstantial evidence.

The provision in the will of 1961 bequeathing the homestead to Langston Smith made an unnatural disposition of the property in that it preferred one child, one who had wronged her, over others. This provision leaves the bulk of the estate to one whose equal right thereto is highly doubtful. The will also contained a recital that all of Langston Smith's debts to the estate have been discharged and paid in full; stating further, that the remaining children are to be held accountable for any debts they might owe the estate.

In Long v. Long, supra, the Court said:

" * * * the fact that a testator has left a will that is unnatural in its terms, and makes a difference between those who, according to natural law, ought to stand equal as to his bounty, may be considered as a circumstance along with other circumstances in determining whether or not the will was a product of undue influence."

This brings us again to the question of testamentary capacity, which is generally defined as the ability to know and understand the business in which the testatrix is engaged, the effect of the act of making the will, the capacity to know the ob-

jects of her bounty and their claims upon her and the general nature and extent of her property. Nass v. Nass, Tex.Civ.App., 224 S.W.2d 280; affirmed, 149 Tex. 41, 228 S.W.2d 130. In addition to the evidence of the physical and mental condition of the testatrix as regards her testamentary capacity set out above, the deceit practiced upon her by her son would have made it impossible for her to have had the knowledge of her estate necessary to fulfill the above quoted requirements.

In defining undue influence for the jury, the court submitted the following:

"The term 'undue influence' means such influence as, under the facts and circumstances of the case, destroys the free agency of the testatrix, and substitutes in place thereof the will of another. Such undue influence may be exercised through fraud, artifice, deceit, stealth or cunning * * *."

■■ In Texas fraud in the inducement of a dispositive instrument and undue influence are treated as one and are not dealt with separate and apart as in some other jurisdictions, Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208. Consequently, in view of the testimony in this record of Langston Smith's complete disregard of any principle in dealing with his mother's estate would certainly raise an inference of fraud as to his conduct in procuring the will of 1961 that he had his mother sign and the contents thereof.

On the issue of mental capacity, appellants offered several witnesses as to the strong will, alert mind and sound business judgment of the testatrix. When it was shown that Langston Smith was able over a number of years to steal large sums of money from his mother, using the crudest and most obvious means in some instances, only two conclusions can be reached as to why Mrs. Smith did not discover the losses. First, she was not as smart, strong willed or alert as appellants contend; or secondly, Langston Smith was able to exercise a tremendous amount of influence by the use of "fraud, artifice, deceit, stealth or cunning," as defined by the court to be undue.

There are numerous cases holding that where intent, scienter, or state of mind is a material issue in a case, it is proper to admit evidence of similar acts or transactions to show the existence of a plan, scheme or design. Goree v. Uvalde Nat. Bank, Tex. Civ.App., 218 S.W. 620, writ dism. Especially on the issue of fraud, evidence of other fraudulent acts by the alleged perpetrator of the fraud is generally held admissible on the issue of intent, scienter or state of mind. 23 Tex.Jur.2d, Sec. 189, p. 287.

■ Under the facts of this case we do not feel that because no defalcations on the part of Langston Smith were shown after 1955 when he was removed from the control of the family estates, they cannot be considered here. Langston Smith and his wife moved into the same house with Mrs. Smith in February of 1961 with the events following which were described above. His actions in the past had laid a predicate for a finding of a state of mind from which inferences, when coupled with other circumstances, weave a warp and weft into a general pattern that the jury had a right to consider. Here the question of remoteness was a matter for the trial court to determine in the light of all the other evidence. Broesche v. State, Tex.Civ.App., 348 S.W. 2d 770.

Again quoting from Long v. Long, above:

"It is rarely possible to prove undue influence by what is generally known as direct testimony. Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and circumstances. Usually a person charging undue influence must substantiate such charges by circumstances extending over a considerable length of time. It is therefore the settled rule that undue influence can he established by what is

known as circumstantial, as well as direct, evidence."

■ We offer the foregoing in answer to appellants' fourth, fifth and sixth points which are: The trial court erred in entering judgment denying probate of the will dated September 19, 1961 on the finding of the jury that Kate Montgomery Smith in executing said will was acting under undue influence of Langston Smith, because such finding is unsupported by any evidence of probative value and is contrary to all evidence; that such finding is so contrary to the overwhelming weight and preponderance of the evidence as to be unreasonable, unjust and manifestly wrong; that such finding was the result of extreme bias and prejudice in the minds of the jury created by evidence of acts of Langston Smith committed at times too remote from the date of said will as to have any bearing upon or relation to a showing of any undue influence by Langston Smith upon Kate Montgomery Smith in executing said will.

We overrule these points.

We also overrule appellants' seventh and last points of error complaining of the trial court's action in overruling appellants' motion made at the close of appellees' evidence. This was a motion to strike all evidence relating to defalcations, misuse of money, or other similar acts relating to accounts of Kate Montgomery Smith by Langston Smith prior to 1955, which were not connected by evidence with any matter or fact that could or did have any bearing upon the testamentary capacity of Kate Montgomery Smith or to show in any manner that said acts so remote in time could or did form any basis for a finding of undue influence by Langston Smith upon Kate Montgomery Smith at the time she executed the will of September 19, 1961.

We affirm the judgment of the trial court.

Affirmed.