The TRUST DEPARTMENT OF the FIRST NATIONAL BANK, Administrator with the Will Annexed of Hollie Heflin, Deceased, et al., Appellants,

v.

W. W. HEFLIN et al., Appellees.

Court of Appeals of Kentucky.

Feb. 2, 1968.

Rehearing Denied April 26, 1968.

---

Farland Robbins, Mayfield, for appellant.

Henry Jack Wilson, Mayfield, for appellee.

DAVIS, Commissioner.

This is a will contest in which a jury found that Hollie Heflin lacked testamentary capacity. The propounders of the will prosecute this appeal, asserting as the chief ground for reversal that there was insufficient evidence to warrant submission of the case to the jury.

To avoid confusion we shall refer to the testator, Hollie Heflin, as Hollie. The purported will was executed December 24, 1962, and by its terms, Hollie's entire estate was devised to his nephew, Robert Earl Green. The value of the estate was about $34,000. Hollie was seventy-six years of age when he died on May 1, 1963.

Hollie was one of seven children. He was never married and left surviving him two brothers and one sister, as well as children of another brother who had died before Hollie's death. The sole beneficiary is the son of the sister who survived Hollie.

Hollie lived on the "home farm" with his unmarried brother, Lubie, and his unmarried sister, Lexie, both of whom died be-

fore the date of Hollie's death. Hollie's mother, after a lingering twenty-year illness, died in 1930. The loss of his mother affected Hollie to the extent that he had a "mental breakdown," followed by an apparent attempt at suicide in 1931. Hollie's mental condition at that time deteriorated to the point that he was adjudged of unsound mind and committed to the Western State Hospital where he remained for about a week. He was able to leave the hospital and gradually resume his normal activities without specific incident indicating any mental relapse. In 1938 he was adjudged to be of sound mind and legally restored as provided by KRS 202.290. There was evidence explaining that the restoration proceedings were not had earlier than 1938 simply because there was no occasion for Hollie to execute any legal documents until that time.

Hollie was a farmer and took pride in his recognized ability in handling mules and plowing a singularly straight furrow. He was described as a "perfectionist" who became inordinately exasperated whenever he was unable to attain the result he desired in the matter of repairing farm machinery or doing other chores of that nature. Hollie attended school through the eighth grade and was able to read, write, and handle elementary mathematics.

More than twenty witnesses testified on each side of the case. The only medical testimony was negative in nature. Dr. Colley testified as to having treated some physical infirmities for Hollie during the recent years before the execution of the will, but he expressly declined to give any opinion as to Hollie's mental capacity. Dr. Colley insisted that the professional services which he had rendered had no relation to any mental disorder and that he had not addressed his attention to that matter so as to enable him to express an opinion one way or the other.

To undertake an individual analysis of the evidence of each witness would unduly lengthen this opinion. A general summary of the aberrations mentioned by witnesses for the appellees, not including some incidents which occurred during the last few days of his terminal illness, is as follows:

Testator had a "mental breakdown" in 1930 following the death of his mother, was adjudged of unsound mind, and committed to Western State Hospital from which he was released after about a week.

Testator had attempted suicide in 1931 during convalescence from the "breakdown"; he was legally restored in 1938 pursuant to KRS 202.290.

He was "subnormal" and "submental," which was explained as meaning "a little under par."

He had a few "falling out spells all through 1962." These "spells" were described as blackouts similar to those experienced by W. W. Heflin, Hollie's brother, who gave the testimony concerning them.

His general attitude was variously described as one of "extreme pessimism," "ascetic," "hypersensitive," "ultra conservative," "miserly," and a "fanatic about religion."

Some of the witnesses described Hollie's mental condition as like a "ten-year-old boy."

Another witness said he "couldn't talk intelligent to you" (without citing specific examples).

Hollie purportedly sought to have a five-dollar bill changed, but mistakenly submitted a ten-dollar bill instead of a five.

He would sit in the same seat at church and would not talk to his fellow worshippers "without you said something to him."

At various times he would say he was "worth ten thousand dollars, or twenty thousand, or thirty thousand dollars."

He frequently pointed out certain calves as being twin calves, when in

truth the twin calves had already been sold.

When "you would get to talking to [testator] about a subject he would turn it off on something else."

He was "peculiar."

So long as Hollie, Lubie, and Lexie all lived together, they had an informal farm partnership. For the most part, the details of clerical work were handled by Lubie or Lexie and not by Hollie. It seems plain from the record that Lubie took the lead although Hollie usually accompanied him in the various farming transactions. All of the witnesses said that Hollie was a kind man, and none of them recalled any occasion when Hollie failed to recognize them (except during the last day or two of his terminal illness when he was admittedly in a feeble condition of mind and body).

For the propounders, it was shown that the will was executed with due formality on December 24, 1962, at Mayfield, in the law offices of Honorable Farland Robbins, an attorney of that city. The evidence disclosed that the testator had arranged with the chief beneficiary for the latter to transport him into town on the Friday before the Monday on which the will was signed. Mr. Robbins testified that the testator apprised him of his intention to have a will drafted leaving his entire estate to the nephew and explained that when he learned this, he directed the nephew to remain out of the office in which the will was being prepared. Mr. Robbins expressed the unqualified opinion that the testator possessed requisite mental capacity at the time the will was executed.

There were other bits of evidence showing that the testator had signed deeds during 1962, at least one of which was incident to conveyance of land to W. W. Heflin, one of the chief contestants. The testator had signed checks including checks to W. W. Heflin for his room and board during the eighteen months prior to his terminal illness.

Our decisions teach that opinion testimony as to the mental capacity of a testator is admissible, whether the evidence is presented through medical experts or laymen, e.g., Tye v. Tye, 312 Ky. 812, 229 S.W.2d 973; McKinney v. Montgomery, Ky., 248 S.W.2d 719; 8A Kentucky Digest, Evidence, ☞501(3) and 568(2). It is equally clear that nonexpert opinion evidence relating to testamentary capacity is not sufficient to make a jury issue or support a verdict against the will, unless the opinion is based on facts and circumstances related in the evidence which reasonably induce the belief or opinion expressed by the witness or witnesses. Tate v. Tate's Ex'r, Ky., 275 S.W.2d 597; 8A Kentucky Digest, Evidence, ☞568(2). See Yates v. Wilson, Ky., 339 S.W.2d 458, 463–464.

Our reports are replete with cases presenting widely divergent sets of facts and circumstances, many of which appear to more strongly reflect lack of capacity than do the facts in the case at bar. Yet in the cases referred to, some of which we shall list, the court has consistently held that the verdict against the will was unsupported by the evidence. As typical of this line of cases (by no means a complete list), reference is had to Dossenbach v. Reidhar's Ex'x, 245 Ky. 449, 53 S.W.2d 731; McCrocklin's Adm'r v. Lee, 247 Ky. 31, 56 S.W.2d 564; Clark v. Johnson, 268 Ky. 591, 105 S.W.2d 576; Kentucky Trust Co. v. Gore, 302 Ky. 1, 192 S.W.2d 749; Bickel v. Louisville Trust Co., 303 Ky. 356, 197 S.W.2d 444; Rice v. Pack, 306 Ky. 777, 209 S.W.2d 327; and Gerard v. Gerard, Ky., 350 S.W.2d 719.

It appears from this record that the witnesses who opined that Hollie lacked testamentary capacity based their opinions chiefly upon his eccentricities. In 1 Kentucky Practice, Section 270, Page 200, it is said in part (supporting citations omitted):

"An insane delusion must be distinguished from an eccentricity. Peculiar beliefs and extraordinary conduct may be entirely compatable (sic) with testamentary capacity. In a will contest there is

**132**

apparently no end to the peculiarities of testators which disappointed relatives can dredge up. Evidence of most of these peculiarities is admissible. * * *. By way of illustration some of the more common eccentricities have been considered.

"Personal habits which are unorthodox do not establish mental unsoundness. For example, a person with testamentary capacity may by preference sleep on straw covered with old sacks and use his Texas saddle for a pillow, or he may sleep with the dogs. A belief that everyone else in the world is needlessly extravagant is not a bar to making a will.

"Efforts to interest members of the opposite sex in a matrimonial venture may be regarded as quite normal despite a difference in ages. Repeatedly showing the family album to visitors may be merely the remnant of an old-fashioned custom. That the testatrix wished to be buried with her husband's cane, a pistol in each hand and her eyes open was said to be 'unusual,' but no evidence her mind was unsound."

The appellees have cited Creason v. Creason, Ky., 392 S.W.2d 69; Blankenship v. Blankenship, Ky., 389 S.W.2d 933; Ward v. Norton, Ky., 385 S.W.2d 193; Roland v. Eibeck, Ky., 385 S.W.2d 37, 7 A.L.R.3d 992; McKinney v. Montgomery, Ky., 248 S.W.2d 719; Pardue v. Pardue, 312 Ky. 370, 227 S.W.2d 403; Hines v. Price, 310 Ky. 758, 221 S.W.2d 673; and Pfuelb v. Pfuelb, 275 Ky. 588, 122 S.W.2d 128, as well as two cases from Texas and one from Tennessee. We have examined carefully each of these cited authorities and note that for the most part there was qualified, expert medical testimony in addition to the lay proof. In nearly all of the cited cases there was evidence supporting undue influence as well as lack of mental capacity, in which situation we have frequently said that the evidence which tends to show both lack of capacity and undue influence "* * * need not be as convincing as would be essential to prove one or the other alone." See Roland v. Eibeck, Ky., 385 S.W.2d 37, 40. In Ward v. Norton, Ky., 385 S.W.2d 193, relied on by appellees, there was no issue raised touching the sufficiency of the evidence as to lack of capacity, but the court noted that it was questionable whether the evidence on that score was sufficient to sustain the verdict and cited many cases. Ward v. Norton, Ky., 385 S.W.2d at 195; Smith v. Smith, Tex.Civ.App., 389 S.W.2d 498; and Seigler v. Seigler, Tex.Civ.App., 386 S.W.2d 849, relied on by appellees, are cases in which there was medical and lay testimony reflecting lack of capacity, and in each case the contest was pitched on the combined grounds of undue influence and lack of capacity. The other foreign case cited, In Re Padgett's Will, 54 Tenn.App. 1, 387 S.W.2d 355, is not apposite, as it deals with questions unrelated to the one at bar.

We think it may not be said that the will before us is an unnatural will, even though it results in devising the relatively modest estate to one nephew to the exclusion of all other members of Hollie's family. There was evidence that would support the proposition that the disposition was a natural and normal one in light of the circumstances in which the testator wrote it. The propounders met the preliminary burden of showing mental capacity as discussed in Holden v. Bennett, 243 Ky. 667, 49 S.W.2d 568, even if it were assumed that the will was so irrational on its face as to make it apparent that it was the result of lack of testamentary capacity.

After a careful review of the entire record, we are persuaded that the evidence adduced for the contestants lacked sufficient probative value, in light of the authorities we have discussed, to warrant submission of the case to the jury on the issue of lack of testamentary capacity. It follows that the court erred in failing to grant the propounders' motion for a directed verdict and in failing to sustain propounders' timely motion for judgment n.o.v.

The judgment is reversed with directions to enter a new judgment upholding the will of Hollie Heflin and affirming the judgment of the Graves County Court admitting said will to probate.

All concur.